UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:10 CV 522 BR

| | |
|---|---|
| LORI FREEMAN,                     ) | |
|                           ) | |
|        Plaintiff,               ) | |
|                           ) | **MEMORANDUM IN SUPPORT** |
| v.                              ) | **OF DEFENDANT'S MOTION** |
|                           ) | **FOR SUMMARY JUDGMENT** |
| DAL-TILE CORPORATION,     ) | |
|                           ) | |
|                           ) | |
|        Defendant.           ) | |

Plaintiff Lori Freeman has sued her former employer, defendant Dal-Tile Corporation, claiming that Dal-Tile should be held liable for the racially and sexually hostile work environment allegedly created by a third-party customer, Timothy Koester, who made a handful of inappropriate comments over a three-year period. Freeman also asserted claims against Dal-Tile for retaliatory demotion and constructive discharge, and she recently amended her Complaint to add a claim for civil obstruction of justice relating to Dal-Tile's alleged failure to preserve evidence relating to her claims.

Dal-Tile has moved for the entry of summary judgment regarding all of Freeman's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. As shown below, no genuine issue exists as to any material fact and Dal-Tile is entitled to judgment as a matter of law. Consequently, Freeman's claims should be dismissed with prejudice in their entirety.

## SUMMARY OF THE CASE

Freeman filed her initial Complaint against Dal-Tile,[1] its customer VoStone, Inc., and VoStone's sales representative Timothy Koester. [Doc. 5]. She asserted claims against all defendants for the creation of a racially hostile work environment in violation of 42 U.S.C. 1981 ("Section 1981"), against Dal-Tile for subjecting her to a racially and sexually hostile work environment in violation of Title VII of

---

[1] The initial Complaint incorrectly named as a defendant Dal-Tile's parent company, Mohawk Industries, Inc., which was not her statutory employer. The parties later stipulated to the substitution of Dal-Tile and the amendment of the caption to reflect the proper parties. [Doc. 54].

1895375.1

the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and against Dal-Tile for retaliatory demotion and constructive discharge under Section 1981.

In lieu of answering the Complaint, VoStone filed a motion to dismiss under Rule 12(b)(6). [Doc. 22]. Freeman subsequently dismissed her claims against VoStone. [Doc. 26]. Koester, acting *pro se*, answered Freeman's Complaint and also moved to dismiss the claims asserted against him. [Doc. 27]. Freeman entered into a Stipulation of Dismissal as to her claims against Koester [Doc. 32], on the express condition that Koester sign a declaration regarding factual matters at issue in this lawsuit. Koester Dep. 10-16, 42-49, Ex. 9.

The parties proceeded with discovery, and Freeman moved for leave to amend her Complaint to add new claims under North Carolina law for wrongful discharge and civil obstruction of justice. [Docs. 44-1 and 44-2]. The Court denied Freeman's motion to the extent she sought leave to allege wrongful discharge, but allowed her to add the civil obstruction claim. [Docs. 52 and 55]. This matter is now before the Court on Dal-Tile's Motion for Summary Judgment.

## STATEMENT OF FACTS

For the limited purposes of these summary judgment proceedings, Dal-Tile recites the pertinent facts, in the light most favorable to the plaintiff, as follows:

Dal-Tile, a wholly owned subsidiary of Mohawk, manufactures, distributes and markets ceramic tile and natural stone products. 30(b)(6) Dep. 5-6. It operates eight manufacturing facilities, five regional distribution centers, and over 250 sales service centers (including both stone yards and tile showrooms). Diksa Aff. ¶2. Dal-Tile products are sold through its company-owned sales service centers, home retail stores and independent distributors. *Id.*

In June 2008, Dal-Tile purchased one of its stone distributors Marble Point, Inc., from owner Marco Izzi and opened its center in Raleigh (the "Stoneyard"). Diksa Aff. ¶3. After this sale, Izzi purchased an ownership interest in VoStone, a Raleigh-based kitchen and bath remodeling center which is a customer of Dal-Tile. Izzi Dep. 8-9; Freeman Dep. 202, 210-11, 217-18. Koester worked as an independent sales representative for VoStone. Koester Dep. 17-18; Vose Dep. 9-10; Izzi Dep. 12-13. In

this capacity, he purchased wholesale products from Marble Point (before Dal-Tile's acquisition) and Dal-Tile (post-acquisition). Koester Dep. 17-18; Holland Dep. 14, 35; Freeman Dep. 99-102.

**Freeman's Employment History.**

In August 2006, Freeman began working as a receptionist for Dal-Tile's predecessor, Marble Point. Freeman Dep. 87-88. She was hired on a temporary basis through a staffing agency and, after six months, she joined Marble Point as a regular employee. *Id.* at 87-90, 112. Throughout her tenure there, Freeman reported to Izzi and assistant manager Sara Wrenn (now Holland). *Id.* at 88; Holland Dep. 10. Freeman enjoyed a good working relationship with her managers and other colleagues. Freeman Dep. 90-98. She described the work environment as "very relaxed" and "close-knit." *Id.* at 90-98, 103-06.

Following the acquisition of Marble Point, Freeman became a Dal-Tile employee. *Id.* at 127-28. On June 10, 2008, Regional HR Manager Cathy Diksa visited the Raleigh Stoneyard and held a group meeting with the employees to review Dal-Tile's policies and employee benefits programs. *Id.* at 132-33; Holland Dep. 11-12; Diksa Aff. ¶5. At that time, Freeman received Dal-Tile's employee handbook, including its policy prohibiting harassment and discrimination. Freeman Dep. 127-128, 131-136, Exs. 5-8. Dal-Tile's policy against harassment, which was in place throughout Freeman's tenure, states that Dal-Tile will not tolerate harassment based on an individual's sex, race, color, or other protected characteristics, defines the sort of conduct prohibited, provides avenues for employees to report harassment to the company, and prohibits retaliation against individual who raise complaints under the policy. *Id.* at 133, Ex. 6; Diksa Aff. ¶6, Ex. C.

Freeman's first job position at Dal-Tile was General Office Clerk. Freeman Dep. 159. Over time, she began interacting more frequently with Dal-Tile's customers and effectively functioned as a Customer Service Representative. *Id.* at 159-63. Her official job title did not change, however, until May 2009, when she was promoted to SSC Sales Consultant. *Id.* At the time of her promotion, Freeman did not receive a pay increase. Diksa Aff. ¶13.

The Sales Consultant position was a new inside sales role created in early 2009, which essentially added direct selling responsibilities to the existing Customer Service Representative duties that Freeman

was already performing. Diksa Aff. ¶8. Dal-Tile created this new Sales Consultant position in an attempt to enhance its relationships with customers who had not historically done a large volume of business with the company and consequently were not assigned to any particular Sales Representative. *Id.*

The Sales Consultant position did not work out well at many of Dal-Tile's locations. *Id.* at ¶15. This included the Raleigh Stoneyard, where due to the nature of the business operations, there were not many unassigned house accounts available for Freeman to handle. *Id.* at ¶¶16-17. As a result, Freeman's position was reclassified in November 2009 to Customer Service Representative. *Id.* at ¶¶19-20, Exs. F, G. This job reclassification did not result in any decrease in Freeman's pay or employee benefits.[2] *Id.* at ¶20; *see also* Freeman Dep. 272.

**Koester's Alleged Harassment.**

From the outset of her employment at Marble Point, Freeman interacted with Koester almost daily while he was conducting business with the stone distributor on behalf of VoStone. Freeman Dep. 99-101. Freeman testified that she was "friendly" with Koester, as long as he was not making "lewd comments." *Id.* at 193; *see also id.* at 250 (Freeman was friends with Koester on Facebook while she worked at Dal-Tile); Koester Dep. 28, 40-41 (Freeman used to joke around with Koester; "I thought we were friends"); Holland Dep. 58-60 (Freeman and Koester "just had a relationship where they gave each other crap back and forth all the time").

Freeman claims that she heard Koester make inappropriate remarks while she worked for Marble Point. In August or September 2006,[3] Freeman overheard Koester as he walked into Wrenn's office and,

---

[2] Freeman testified that, due to the reclassification, she was no longer eligible to enroll in the SSC Sales Consultant Incentive Program, a rewards program designed to provide an incentive for Sales Consultants to work with the smaller revenue generating customers. Freeman Dep. 159, 272-73, 292-93; Diksa Aff. ¶12. However, the only rewards Freeman had ever received through that program was a pair of movie tickets and an MP3 player, which she received as prizes for completing the online Sales Consultant training and certification program. Freeman Dep. 292-93; Diksa Aff. ¶17. Because she was never assigned any accounts as a Sales Consultant, Freeman was never fully enrolled in the incentive program and never earned any incentive rewards based on inside sales activities. Diksa Aff. ¶17.

[3] Freeman testified that this exchange in Wrenn's office occurred in August or September 2006, within a couple of weeks after she began working as a temp for Marble Point. Freeman Dep. 109, 122-24. She further testified that the documentation she had prepared prior to her deposition inaccurately stated that

referencing a photograph of two former employees, asked Wrenn and another employee, "Who are these two black bitches?" Freeman Dep. 107-10. Wrenn replied, "They used to work here and I would appreciate you not to use that language here." *Id.* at 108. The next day, Freeman told Koester that his remark was demeaning and made her feel uncomfortable, and she asked him not to use that sort of language. *Id.* at 107. Koester apologized immediately and promised it would not happen again. *Id.* Freeman also recalled Koester making comments about women he had been with the night before and, on one occasion, showing her a photograph of a naked woman on his cell phone and remarking that this was what he had left in his bed that morning. *Id.* at 115-16.

According to Freeman, Koester engaged in other inappropriate behavior on three separate occasions after Dal-Tile acquired the Stoneyard in June 2008.[4] In July or August 2008, Koester used Freeman's phone to discuss an order with Zack Reynolds, who worked at VoStone. As the conversation came to an end, Koester said, "Hey Zack," placed the receiver near his buttocks and passed gas, and then laughed and handed the phone back to Freeman. *Id.* at 117-18; *see also id.* at 121, Ex. 4, DALTILE00089. According to Freeman, she called Koester a "nasty bastard" and then walked away in tears. *Id.* Koester wiped off the phone and apologized, explaining that it was just a joke. *Id.* at 117; *see also id.* at 121, 124-25, Ex. 4, DALTILE00089.

---

this incident took place in September 2007. Freeman Dep. 121, Ex. 4, DALTILE00091. In her First Amended Complaint, however, Freeman changed her factual assertions to state that this incident occurred in September 2007—not in September 2005, as stated in her original Complaint, or in August-September 2006, as stated in her deposition. *Compare* Doc. 5, ¶15 and Doc. 55, ¶13. At any rate, the unverified Amended Complaint does not suffice to create a fact issue for purposes of these summary judgment proceedings, particularly given Freeman's unambiguous deposition testimony that the incident occurred in August or September 2006 and that her documentation to the contrary is incorrect.

[4] Freeman also testified that, at some unspecified time she cannot recall, she was walking past Koester as he was talking with Jodi Scott ("Scott") about photographs of Scott's daughters that were displayed in Scott's office. Freeman Dep. 206-07. According to Freeman, she overheard Koester say "I'm going to hook up with one of your daughters" or "I'm going to turn your daughters out," and Scott replied, "You better stay away from my kids" or "Don't talk to me about my kids." *Id.* Freeman cannot recall the exact time "or even the year" this supposedly occurred. *Id.* Scott—who, unlike Freeman, actually participated in this conversation—testified that Koester simply commented that her daughters were "hot," and he made no inappropriate remarks about them. Scott Dep. 11-12.

Almost a year later, on June 3, 2009, Koester called Freeman about covering a customer appointment for him, and indicated that he had been partying the night before. *Id.* at 125-27, 136-45; *see also id.* at 121, Ex. 4, DALTILE00088. During that conversation, Koester joked about his wild night and said, "Lori I'm so fucked up I did so much coke and popped all kinds of pills, I'm so fucked up, Lori, don't take offense, but I'm as fucked up as a Nigger's checkbook." *Id.* Freeman claims that she told Wrenn about Koester's comment that same day. *Id.* Wrenn denied that Freeman reported the comment to her at that time and instead testified that she first learned of this remark after Freeman's complaint to HR in late July or early August 2009. Holland Dep. 23, 30-31. According to Freeman, she also reported Koester's remark to James Vose, co-owner of VoStone. Freeman Dep. 145-47.

On July 29, 2009, Koester called Dal-Tile's general office line[5] from the road, with his eight-year-old daughter Angelina in the car, and Freeman answered the phone. *Id.* at 151-54, 195-96; Koester Dep. 15, 35; *see also* Freeman Dep. 121, Ex. 4, DALTILE00080. Koester said, "Hey, Lori, this is Tim," and then Angelina kept interrupting him while he was trying to talk with Freeman about a customer order. Freeman Dep. 151-52. Freeman, who knew Angelina well and had watched her many times when Koester brought her to visit the Stoneyard, asked Koester to tell Angelina "hi." *Id.* at 152, 194-95; Koester Dep. 15, 40-41, 52-53. Koester put Freeman on speakerphone so that Freeman and Angelina could say "hello" to one another. Freeman Dep. 152-53. According to Freeman, she heard Angelina ask, "Daddy, who's that?" and Koester replied, "That's the black bitch over at Marble Point." *Id.* Koester denies saying "black bitch" and instead claims that he told Angelina it was the "crazy black girl" from Marble Point. Koester Dep. 15, 52-53. Freeman claims she told Koester, "Don't you ever call me a black bitch as long as you live," and Koester responded, "Oh, word." Freeman Dep. 153-154. Freeman further asserts that she told Wrenn about Koester's comment and, as Freeman was preparing to leave work about ten minutes later, Wrenn said, "Don't worry, we'll take care of it." *Id.* at 153-157; *see also id.* at 21, Ex. 4, DALTILE00080.

---

[5] No one at the Dal-Tile sales center had direct dial phone lines; consequently, all incoming calls came to the general office line. Freeman Dep. 238.

1895375.1

**Freeman's Complaint and Dal-Tile's Remedial Actions.**

On July 30, 2009, Freeman called the Stoneyard at 6:45 or 7:00 a.m., knowing Wrenn would not yet be there, and told her co-worker Jodi Scott that she was very upset and would not report to work that day. Freeman Dep. 157-58; *see also id.* at 121, Ex. 4, DALTILE00080-81. Freeman then called Diksa and left a message on her cell phone. *Id.* at 166-168; *see also id.* at 121, Ex. 4, DALTILE00080-81. Diksa returned Freeman's call around 9:00 or 9:30 that same morning, and Freeman told Diksa that Koester had called her a "black bitch." *Id.* at 168-69. Diksa asked Freeman what she would like to have done, and Freeman replied that she could not work with Koester anymore. *Id.* Freeman recalls Diksa stating that Koester would be "banned." *Id.* After Diksa reminded her to notify her manager of her absence, Freeman contacted Wrenn and apologized for not calling her earlier. *Id.* at 190-91. Freeman explained that she was extremely upset and had needed time to calm down. *Id.*

After discussing the matter with Freeman and Diksa, Wrenn told Vose and Koester that Koester should not visit the Stoneyard until further notice. Holland Dep. 31-32. Wrenn also informed Freeman she had relayed those instructions to Vose and Koester. Freeman Dep. 192; Holland Dep. 32.

Meanwhile, on August 4, 2009, Koester needed to pick up some Dal-Tile samples. Freeman Dep 196-98. The materials were left outside the building so that Koester could pick them up without entering the building or encountering Freeman. *Id.* Freeman saw Koester pull up in his car to get the samples, but he did not enter the building or speak with her. *Id.* at 197-98, 231-32.

The next day, August 5, Freeman e-mailed Diksa and Wrenn, requesting clarification on the parameters of Koester's "ban" and to what extent she would have to continue to deal with him. *Id.* at 198-99, Ex. 10. Diksa replied on August 6 and indicated that she would be traveling to Raleigh the following week and would meet with Freeman to further discuss the situation involving Koester and be sure "we are all on the same page." *Id.* at 198-99, 201, Ex. 11.

On August 11, 2009, Diksa met with Freeman at the Stoneyard to discuss Freeman's concerns about Koester's behavior. *Id.* at 202-203; Diksa Dep. 19-25. Freeman reported the latest "black bitch" comment, as well as the checkbook remark. Freeman Dep. 202-04. After talking with Freeman privately,

Diksa called Wrenn into the meeting. *Id*. Diksa told Freeman that Dal-Tile would not tolerate the sort of behavior Freeman had reported, regardless of whether it was a customer or a fellow company employee, and when similar circumstances happened in other locations, Dal-Tile had done its best to keep people separated so there would be no discomfort. Diksa Dep. 10-11, 19-20, Ex. 1, DALTILE00100-01. Diksa stated that she would investigate and come up with a solution. *Id*. According to Freeman, Diksa stated that Koester would be suspended for six months. Freeman Dep. 211-12.

While she was in Raleigh on August 11, Diksa also met individually with Wrenn and with Dal-Tile employee Patrick Pendry, whom Freeman had identified as a witness to Koester's alleged "black bitch" comment on the phone. Diksa Dep. 10-11, 20-21, Ex. 1, DALTILE00101. Pendry indicated that he had heard Koester make the comment while he was standing near Freeman's desk. *Id*.

After her meetings in Raleigh, Diksa reported the results of her investigation to Regional Vice President, Scott Maslowski. *Id*. at 10-11, 26-28, Ex. 1, DALTILE00101; Maslowski Dep. 7-8. Specifically, she told Maslowski about the inappropriate remarks Freeman had reported and her conclusion that Koester's behavior should not be tolerated. *Id*. at 26-27. Maslowski and Diksa discussed various solutions that would permit Koester to continue doing business with Dal-Tile on behalf of VoStone, but limit any contact between him and Freeman. *Id*. at 26-28; Maslowski Dep. 13-14, 19-20.

On August 12, 2009, Izzi sent an e-mail to Maslowski and Wrenn, describing the joking banter that he personally had witnessed going back and forth between Koester and Freeman, and asking Dal-Tile to specify its position regarding Koester's ability to do business with the Raleigh Stoneyard. Diksa Dep. 28-29, Ex. 4; Maslowski Dep. 20, Ex. 4.

Maslowski, Izzi and Freeman met on August 18, 2009, to discuss a potential resolution that would both protect Freeman and maintain Dal-Tile's business relationship with VoStone. Freeman Dep. 218-21; Maslowski Dep. 20-25; Izzi Dep. 18-23. Freeman was asked to consider a solution that would allow Koester to continue doing business with Dal-Tile, and she indicated that she needed time to think this over. Freeman Dep. 221, 224; *see also id*. at 121, Ex. 4, DALTILE00083-84; Maslowski Dep. 25-26.

Maslowski decided, with input from Diksa, that Wrenn would serve as Koester's point person at Dal-Tile and that Koester was to have no further contact with Freeman, either in person or over the phone, for six months. Diksa Dep. 10-11, 30-32, Ex. 1, DALTILE00101; Maslowski Dep. 27-28. On August 31, 2009, Diksa sent a letter to Izzi communicating Dal-Tile's decision. Diksa Dep. 34-36, Ex. 5; Izzi Dep. 27. Koester testified that he was told not to go near Freeman anymore. Koester Dep. 53.

**Koester's Ongoing Business-Related Contacts With Dal-Tile.**

While these events were transpiring, Koester was attempting to complete a sale to Elaine Wiggins, a customer whom Freeman had referred to him. Freeman Dep. 232-33, 236-37; Koester Dep. 56-58. At some point between August 4 and August 29, Koester called Dal-Tile's general office number and Freeman answered the phone. Freeman Dep. 232-33, 236-37. Koester asked whether Wiggins had selected her product and Freeman replied that she had not. *Id.* at 236. That was the full extent of the conversation, which lasted two minutes or less. *Id.*

Koester later sent an e-mail to Freeman on August 28, 2009, stating, "Hey don't worry about Elaine Wiggins tomorrow! She just called and canceled on me. I'll keep you guys posted on what she wants to do." Freeman Dep. 234, 237, Ex. 13; Koester Dep. 23-24, 56-57, Ex. 11.

On August 31, 2009, Koester contacted Wrenn to coordinate a time for him to accompany Wiggins to the Dal-Tile Stoneyard so Wiggins could select her product. Holland Dep. 52-53. After conferring with Diksa, Wrenn decided to arrange Koester's visit while Freeman was at lunch so the two would not encounter one another. *Id.* Accordingly, Wrenn contacted Freeman and asked when she would be going to lunch, and Freeman said she would go to lunch around noon. Freeman Dep. 237; Holland Dep. 52-53. Freeman later called her back and asked whether Koester would be visiting the facility that day. Freeman Dep. 238-243. Wrenn replied that Koester needed to visit the Stoneyard with Wiggins and explained that she was trying to coordinate the visit while Freeman was not there. *Id.* Freeman protested that she thought Koester was "suspended, period" and claimed she was not told Koester could visit the Stoneyard in her absence. *Id.* She then stated that she would not leave the building for lunch after all. *Id.* Wrenn replied that she had already told Koester he could come. *Id.*

1895375.1

Koester visited the Stoneyard with Wiggins, as planned. *Id*. at 240-41. Freeman was in the front office when she saw Koester and Wiggins outside the building. *Id*. at 240-41, 246-50. According to Freeman, Wiggins started to enter the front office, and Koester said, "No, let's go around the other way," and they walked around the building and entered the warehouse area in the back. *Id*. Freeman testified that she went to the break room and then left the building and "just kind of drove around" until she confirmed with a co-worker that Koester was no longer there. *Id*. Freeman did not encounter either Koester or Wiggins during that visit. *Id*.

The next day, September 1, Freeman sent an e-mail to Wrenn stating, "I just wanted to say that I am not happy with [Koester] coming here whether I am at lunch or not. I do not want to make a big deal out of this but I at least wanted to express my dissatisfaction of this." *Id*. at 243-44, Ex. 14. Freeman also called Dal-Tile's employee relations hotline to report her displeasure with Koester's visit. *Id*. at 241-42. Her hotline call was referred to Diksa, who contacted Freeman that same day. *Id*. at 242-245. Diksa told Freeman that Dal-Tile had determined that Koester still would be permitted to do business with Dal-Tile, but was to direct all of his phone calls to Wrenn's cell phone and have no contact whatsoever with Freeman. *Id*.; Diksa Dep. 10-11, Ex. 1, DALTILE00101.

Aside from the business-related communications described herein, Freeman had no other communications with Koester from July 29, 2009 forward. Freeman Dep. 245-53, 273-75.

**Freeman's Leave of Absence and Resignation.**

According to Freeman, she was so upset about the prospect of Koester being permitted to visit the Stoneyard, even under the "no contact" restrictions, that she went out of work on a medical leave of absence beginning September 2, 2009. *Id*. at 253-54. Freeman was referred to a counselor through Dal-Tile's employee assistance program, and that counselor in turn referred Freeman to a mental health provider. *Id*. at 254-57. Freeman applied for and received short-term disability benefits from Aetna (Dal-Tile's third party insurance carrier) through October 15, 2009. *Id*. at 257-63. After her doctor sent a letter to Aetna opining that Freeman could return to work (which Freeman disputed), Aetna denied Freeman's request for ongoing benefits. *Id*. at 261-62.

1895375.1

Freeman returned to work on November 17, 2009. *Id.* at 268-70. She met with Wrenn, who informed her that Koester no longer worked for VoStone.[6] *Id.* at 271, 273; Holland Dep. 56-57. Wrenn also told Freeman that all of the Raleigh Stoneyard employees were still working 35-hour weeks, as they had done before Freeman went on leave, due to the economic downturn. Freeman Dep. 164-66, 271-72. Finally, Wrenn informed Freeman that she would be placed in a Customer Services Representative position instead of her previous Sales Consultant role. *Id.*

On December 7, 2009, Freeman notified Dal-Tile that she was resigning from her employment effective December 11, 2009. *Id.* at 281, Ex. 19. Her resignation letter contained no explanation, but Freeman testified she resigned because the "depression and anxiety" became too much for her. *Id.* at 281-82. According to Freeman, she "just always had this sense that even though [Koester] was fired from VoStone, regardless of where he worked, he still had the ability to come [to the Stoneyard]." *Id.*

**Administrative Proceedings Before the EEOC.**

While she was on a medical leave of absence, Freeman filed a charge of discrimination dated October 28, 2009, with the U.S. Equal Employment Opportunity Commission. *Id.* at 118-19, Ex. 2. Dal-Tile was not aware of Freeman's charge prior to receiving the EEOC's Notice of Charge dated November 3, 2009. Diksa Aff. ¶¶38, 40, Ex. K.

In her EEOC charge, Freeman mentioned Koester's "black bitch" and checkbook comments and asserted that Dal-Tile had subjected her to discrimination based on her sex and race. *Id.* The EEOC issued a Dismissal and Notice of Rights showing the "Date Mailed" as July 28, 2010. *Id.* at 283-84, Ex. 1. Freeman testified that she received the notice sometime in August 2010.[7] *Id.* at 284. She initiated the instant lawsuit on November 22, 2010—well over 90 days after the EEOC's date of mailing. [Doc. 5].

---

[6] Wrenn told Freeman that Koester worked for Gresham Riggs, another kitchen and bath fabricator. Freeman Dep. 273. She also told Freeman that Koester would continue to contact Wrenn's cell phone if he needed to purchase products from Dal-Tile. *Id.*

[7] The EEOC's investigative file regarding Freeman's charge contains an e-mail from her counsel dated August 21, 2010, stating that Freeman had been notified of the dismissal, but she had not yet received the written Dismissal and Notice of Rights. Tucker Aff. ¶4, Ex. C, DALTILE00066. Dal-Tile received the Dismissal in the mail shortly after the EEOC's mailing date noted on the charge. Diksa Aff. ¶39, Ex. L.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56, Fed. R. Civ. P.; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When considering motions for summary judgment, courts must view facts and inferences in the light most favorable to the non-movant. Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

The moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the non-movant can prove her case. Cray Communications v. Novatel Computer Sys., 33 F.3d 390, 393-94 (4th Cir. 1994). This is consistent with "one of the principal purposes of the summary judgment rule"—namely, "to isolate and dispose of factually unsupported claims or defenses." Celotex, 477 U.S. at 323-24.

## I.    Freeman cannot prevail on her hostile work environment claims.

The prima facie elements of a hostile work environment claim are (1) unwelcome conduct; (2) based on the individual's protected status; (3) that was severe or pervasive, sufficient to create an abusive work environment; and (4) that there is some basis for imputing liability to the employer. See Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir. 1989), *vacated on other grounds*, 900 F.2d 27 (1990). The Court should apply the same substantive legal standards to Freeman's claims under Title VII and Section 1981. Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002).

As described below, Freeman cannot show that Koester's alleged conduct was based on her race or sex, that it was sufficiently severe or pervasive to create an abusive work environment, or that any basis exists for holding Dal-Tile liable for Koester's conduct.

### A.    Untimely Claim Under Title VII

Based on the record evidence, Freeman cannot establish that she filed her lawsuit within 90 days after receiving the EEOC's Dismissal and Notice of Rights, as required to proceed on a Title VII claim.

42 U.S.C. § 2000e-5(f)(1). Where, as here, the actual receipt of an EEOC right to sue letter is unknown, the charging party is presumed to have received it within three days of mailing. <u>Baldwin County Welcome Ctr. v. Brown</u>, 466 U.S. 147, 148 (1984). Here, the EEOC mailed its Dismissal to Freeman on July 28, 2010; thus, applying the three-day presumption, she should have filed her lawsuit by November 1, 2010. Instead, she waited until November 22, 2010 to initiate this action, and her untimely Title VII claim should be dismissed. <u>Severino-Todd v. Wal-Mart</u>, 2011 WL 6370483, at *5 (E.D.N.C. 2011).

**B.     No Actionable Hostile Work Environment Based on Sex or Race**

Federal law "does not provide a remedy for every instance of verbal or physical harassment in the workplace." <u>Lissau v. So. Food Serv.</u>, 159 F.3d 177, 183 (4th Cir. 1998). Anti-harassment laws are not "general civility code[s]" intended to provide a cause of action for mere unpleasantness in the workplace, and not all offensive language and conduct rises to the level of actionable harassment. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998); <u>Hartsell v. Duplex Prods.</u>, 123 F.3d 766, 772-73 (4th Cir. 1997) ("Title VII is not a federal guarantee of refinement and sophistication in the workplace – in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive"). *See also* <u>Meritor Savs. Bank v. Vinson</u>, 477 U.S. 57, 65 (1986) (Title VII was not meant to "insulate [employees] from either the normal day-to-day dissatisfactions and annoyances commonly arising in any workplace or from the sometimes unpleasantness of a surly, strict or even personally insufferable and demanding supervisor"). Accordingly, simple teasing, offhand comments and isolated incidents (unless extremely serious) are insufficient to substantiate a claim of unlawful harassment. <u>Hawkins v. PepsiCo</u>, 203 F.3d 274, 282 (4th Cir. 2000).

To be actionable, the work environment must be both objectively and subjectively offensive; in other words, a plaintiff must show that a reasonable person would find the work environment hostile or abusive, and that the plaintiff did in fact perceive it to be so. <u>Faragher</u>, 524 U.S. at 787; <u>Paroline</u>, 879 F.2d at 105. When determining whether a work environment is objectively "hostile" or "abusive," courts may consider: (1) the frequency of the alleged conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether it unreasonably interferes with the

plaintiff's work performance; and (5) what psychological harm, if any, resulted from the harassment. Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). To be objectively "severe," the conduct must be so extreme that it actually changes the terms and conditions of employment, and the analysis must be conducted by considering "all the circumstances . . . [including] the social context in which particular behavior occurs and is experienced by its target." EEOC v. R&R Ventures, 244 F.3d 334, 340 (4th Cir. 2001) (*quoting* Oncale v. Sundowner Offshore Serv., 523 U.S. 75, 81 (1998)).

Moreover, Freeman must demonstrate that "but for the fact of [her sex or race], she would not have been the object of harassment." Hartsell, 123 F.3d at 772. The relevant question is whether members of the protected class are exposed to disadvantageous terms or conditions of employment to which those outside the protected class are not exposed. Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 965 (8th Cir. 1999). *See also* Oncale, 523 U.S. at 81. Here, some of the so-called "harassment" was sexually and racially neutral, and therefore cannot give rise to an actionable hostile environment. For instance, Koester's behavior in passing gas in Freeman's presence while on the phone with a colleague at VoStone was arguably childish and rude, but does not bear any conceivable relation to Freeman's sex or race.

### 1. Sexual Harassment

As a preliminary matter, Freeman cannot base her sex-based hostile work environment claim on incidents that occurred prior to the 180-day period preceding her EEOC charge. Title VII requires an employee, in non-deferral states, to file a charge of discrimination with the EEOC within 180 days after "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). In Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court explained that a hostile work environment, although compromised of a series of separate acts, constitutes one "unlawful employment practice," and so long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117. To be part of the "same actionable hostile environment claim," the court must examine whether the "pre- and post-limitations period incidents involve[ ] the same type of employment actions,

occurred relatively frequently, and were perpetuated by the same managers." Id. at 120; *see also* McDougal-Wilson v. Goodyear Tire and Rubber Co., 427 F. Supp.2d 595, 617 (E.D.N.C. 2006).

In the case at hand, the pre-limitations period incidents occurred only sporadically and were separated by periods of years. Freeman overheard Koester's first reference to "black bitches" in August or September 2006. She also claims that, at some unspecified time before Dal-Tile's acquisition in June 2008, Koester commented about women he had been with and showed her a photograph of a naked woman in his bed. Then, in July or August 2008, he passed gas in her presence while on the phone with his co-worker, behavior which is completely unrelated to sex. And, at some undetermined point in time, Koester commented about a photograph of Scott's daughters. Finally, on July 29, 2009, Koester engaged in the sole act of arguably sex-based conduct that fell within the 180-day limitations period when he allegedly referenced Freeman as a "black bitch." This single, isolated incident cannot legitimately serve as an "anchor" for the other sex-related behavior that occurred between one and three years previously. *See* Bryan v. Lucent Tech., 307 F. Supp.2d 726, fn. 9 (D. Md. 2004) (alleged harasser's references to the plaintiff as a "troublemaker" and "poison" might have been juvenile and boorish, but that does not transmute that behavior into a continuing gender-based harassment violation).

Additionally, the pre-limitations period conduct occurred before Dal-Tile acquired Marble Point in June 2008 and, consequently, not only involved different managers, but a completely different corporate management and human resources structure. Before the sale, Marble Point's previous owner Izzi oversaw the operations.[8] After acquiring Marble Point, Dal-Tile incorporated the business into its sales services organization and implemented its own policies and practices, installed new management oversight, and provided new corporate HR support. Given these facts, Freeman cannot demonstrate that the alleged harassment was perpetuated by the same managers. Morgan, 536 U.S. at 120.

Regardless of whether the pre-limitations period conduct is considered, Freeman cannot establish that Koester's behavior amounted to severe or pervasive harassment. Freeman has not alleged that

---

[8] Izzi worked for Dal-Tile, reporting to Maslowski, for six months after the sale. Izzi Dep. 11.

Koester ever touched her or propositioned her for sex. Nor has she asserted that Koester threatened or intimidated her. In bringing her sexual harassment claim, Freeman has pointed to one arguably sex-based epithet—"black bitch"—that Koester allegedly uttered twice during the three years she conducted business with him, as well as referencing women he had been with, showing her the photograph of a naked woman on his cell phone, and (at some unspecified time) commenting about the photograph of Scott's daughters. As stated previously, some of these incidents were separated by year-long long gaps where Freeman has identified no inappropriate conduct whatsoever by Koester.

Several Courts, including the Fourth Circuit, have found that conduct much more egregious than that at issue here still does not satisfy the severe or pervasive standard, as a matter of law. *See, e.g.*, Ladd v. Grand Trunk Western R.R., 552 F.3d 495, 500-501 (6th Cir. 2009) (no actionable hostile work environment where manager referred to her as a "black bitch" and co-workers used the words "lesbian," "dyke" and "gay" and made other general sexual remarks, commented that the plaintiff should not be working because she was a woman, and tampered with her equipment); Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 753-54 (4th Cir. 1996) (alleged harasser told the plaintiff that to survive a plane wreck in the ocean he would "find a dead man and cut off his penis and breathe through that," pointing a loaded gun at the plaintiff, and pivoted an illuminated magnifying lens over plaintiff's crotch and asked while looking through the lens, "Where is it?"); EEOC v. Bud Foods, 2006 WL 2265291, at *11 (W.D.N.C. 2006) (co-owner of the company where the plaintiff worked repeatedly subjected her to inappropriate sexual comments, such as, "Come here, let's talk about sex," and "The last time I had a girl your size, she wore the hair off my dick," "I can't fuck you real good because my dick is like this size [indicating with fingers], but I can eat your pussy," looked at her rear and said, "Mmm, mmm, mmm").

### 2. Racial Harassment

Freeman's race-related allegations fare no better under the severe or pervasive standard. The isolated remarks on which Freeman bases her racial harassment claim—the "nigger's checkbook" comment and the two "black bitch" references—are simply not sufficiently severe or pervasive to give rise to a hostile work environment claim. Neither remark could reasonably be construed as threatening or

1895375.1

intimidating.  Indeed, at least one other district court in the Fourth Circuit has held that comments such as "black bitch" or "black dummy" merely constitute "racially neutral profanity." Rose v. Son's Quality Food Co., 2006 WL 173690, at *4 (D. Md. 2006).  That Koester did not use the slur "nigger" to refer to Freeman personally, but instead referenced the term in a self-deprecating reference to his own sorry condition, diminishes its severity. See Ladd, 552 F.3d at 501.  The same is true of Koester's first "black bitches" remark in 2006, when Freeman overheard him referring to a photograph in someone else's office. Id.

Particularly since she was able to identify only three arguably race-related comments over the entire three-year period in which she dealt with Koester, Freeman cannot demonstrate that racial hostility pervaded the workplace or created a racially abusive environment. See, e.g., Faragher, 524 U.S. at 787-88 (isolated incidents are not sufficient); Williams v. CSX Transp. Co., 643 F.3d 502, 513 (6th Cir. 2011) (comments that the plaintiff was a Democrat only because she was a black woman, certain black leaders were "monkeys," and black people should go back to where they came from more closely resemble "mere offensive utterances" rather than conduct that is physically threatening or humiliating); Alexander v. Opelika City Schs., 2009 WL 3739441, at *2 (11th Cir 2009) (eight instances of African-American employee being called "boy" and a noose comment not directed at him were insufficient to establish severe or pervasive hostile environment harassment); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981) (supervisors' alleged use of word "nigger" did not rise to level of actionable harassment); Canton v. United Parcel Serv. Co., 2007 WL 1412763, at *4 (E.D. Wash. 2007) (supervisor's allegedly calling plaintiff "nigger" in context of argument over plaintiff's work performance held not sufficiently severe or pervasive); Martin v. Merck & Co., 446 F. Supp.2d 615, 627 (W.D. Va. 2006) (no actionable hostile work environment where the word "nigger" was used in the plaintiff's presence, a racially offensive cartoon was posted on an African-American employee's office door, an employee was taunted with a noose, another employee was told he needed to "go back to the jungle," and Ku Klux Klan material was shown to an African-American employee on the internet); Orenge v. Veneman, 218 F. Supp.2d 758, 767 (D. Md. 2002) (repeated racial comments such as "whites will never trust blacks again," "blacks are

trying to get a free ride," and "you guys don't pull your weight"); <u>Turner v. Nat'l R.R. Passenger Corp.</u>, 181 F. Supp.2d 122, 132-33 (N.D.N.Y. 2002) (two offensive racial comments, one from a co-worker and one from a foreman, held not sufficiently severe or pervasive).

### C. No Basis for Imputing Liability to Dal-Tile

Finally, Freeman cannot establish that liability for the alleged harassment should be imputed to Dal-Tile. As an initial matter, Freeman has failed to plead that Dal-Tile should be liable for alleged harassing conduct that took place before Dal-Tile's acquisition based on successor in interest liability, much less present facts providing that such liability exists. *See* <u>Barnett v. FreedomRoads</u>, 2011 WL 3360472, at *3 (D. Nev. 2011) (dismissing Title VII claims against successor under Rule 12(b)(6) for failure to plead sufficient facts to give rise to successor in interest liability).

Moreover, Freeman cannot establish that Dal-Tile should be liable for Koester's alleged conduct under the applicable negligence standard for vicarious liability. The Fourth Circuit has yet to publish binding precedent on whether an employer may be liable for alleged harassment by non-employees. However, in a recent unpublished decision, the Fourth Circuit followed precedent from other Circuits and adopted a negligence standard for purposes of determining whether an employer was liable for alleged harassment by a customer. <u>EEOC v. Cromer Food Serv.</u>, 2011 WL 733814, at *4 (4th Cir. 2011). Under this standard, an employer may be liable if it knew or should have known of the harassment and failed to take appropriate steps to halt it. <u>Id.</u>

Dal-Tile acted promptly to end the alleged harassment after Freeman reported that Koester's conduct troubled her. Prior to Freeman's complaint, Wrenn knew that Koester tended to be "crude and tactless," but she felt his behavior was not malicious and she was not aware that his conduct bothered Freeman. Holland Dep. 14-17. In fact, she testified that Freeman seemed to be friendly with Koester and "didn't have any problems sticking up for herself, and she . . . was quick to turn around and call him a faggot or . . . mother fucker, or . . . tell him where to go shove it. [I]f she felt like he was out of line or something was inappropriate, she had no problems informing him of that and putting him in his place, and he'd turn around and tuck his tail between his legs and walk out like he always did." *Id.* at 59; *see also id.*

at 60 ("[E]verybody knew that Tim ran his mouth, and … it was never malicious.  He was just crude, and everybody knew how to handle him and put him in his place, and Lori fell right into that, and she had no problem calling him names.  You know, calling him a dick . . . [C]alling him a man whore . . . [W]hatever it was she felt like he needed to hear at the time."); *id*. at 61-62, 72-73 (Freeman frequently asked Koester for money and to bring her lunch, and she referred customers to him in exchange for kickbacks); Koester Dep. 38-39, 55-59 (Freeman asked Koester for money for Starbucks and referred customers to him in exchange for kickbacks).  When Freeman called to report her absence on July 30, 2009, after complaining to Diksa earlier that morning, Wrenn said she did not realize that Koester's comment had upset Freeman so much.  Freeman Dep. 190-191; *see also* Holland Dep. 23-26, 29-32 (regarding Wrenn's knowledge of Freeman's complaint).

When Freeman raised her complaint, Dal-Tile conducted an investigation, directed Koester to have no further contact with Freeman, and informed VoStone that Dal-Tile would not tolerate Koester's behavior.  To ensure that Freeman did not have to interact with Koester, Wrenn became his point of contact and he was directed to call Wrenn's cell phone if he needed to coordinate any business with Dal-Tile.  Even though Freeman expressed her dissatisfaction that Dal-Tile did not completely ban Koester from the premises, she cannot credibly dispute that Dal-Tile's remedial actions were effective.  After her July 30 complaint, Koester did not engage in any further inappropriate conduct toward her whatsoever.

Given these facts, Dal-Tile cannot be held liable for Koester's conduct.  *See* Crawford v. BNSF Ry. Co., 665 F.3d 978, 984 (8th Cir. 2012) (the employer's business judgment is entitled to some deference with respect to how it handled complaints and, where the employer moved promptly and took appropriate action in response to the plaintiffs' complaints, the fact that employees would have liked harsher responses does not render the policy ineffective); Vance v. Ball State Univ., 646 F.3d 461, 471 (7th Cir. 2011) (no employer liability where harassment complaints were investigated and coworkers were counseled and disciplined as warranted); *see also* Tawwaab v. Va. Linen Serv., 729 F. Supp.2d 757, 773 (D. Md. 2010) (determining, in the context of retaliation claim, that no liability could be imputed to employer for customer conduct where, following the plaintiff's complaint that a customer had made

racially charged remarks, the employer investigated the incident and other members of management assumed responsibility for making deliveries to the alleged harasser's place of business); *compare* Cromer, 2011 WL 733814, at *5 (employer held liable for third-party's harassment when the plaintiff repeatedly tried to communicate the nature and extent of the harassment to four different supervisors (including the son of the chair of the board of directors), complained twice to the chairman himself, and repeatedly asked to be assigned to a different route where he would not have to encounter the harassers, and was effectively ignored by all management, scoffed at, and told to quit being such a "crybaby").

**II.      Freeman cannot establish that she was subjected to a constructive discharge.**

The Supreme Court has held that Title VII encompasses employer liability for constructive discharge. Pa. State Police v. Suders, 542 U.S. 129, 143 (2004). To establish "constructive discharge," the plaintiff must make a further showing, beyond what is required to establish a hostile environment: Freeman must show that "the abusive working environment became so intolerable that the aggrieved employee's resignation was a fitting response." Id. at 143, 147 ("A hostile-environment constructive discharge claim entails something more [than actionable hostile work environment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."). Fourth Circuit case authority further clarifies that plaintiffs must demonstrate that the employer's actions were deliberate and motivated by unlawful discriminatory intent. Honor v. Booz-Allen & Hamilton, 383 F.3d 180, 186-87 (4th Cir. 2004) (internal citations omitted). An employer acts deliberately when it intends its actions to force the employee to quit. Jenkins v. City of Charlotte, 2005 WL 1861728, at *10 (W.D.N.C. 2005).

The record evidence does not suggest that Dal-Tile deliberately subjected Freeman to a such an intolerable work environment that a reasonable person would have felt compelled to resign. As described above, Freeman has failed to present sufficient evidence to make out a hostile work environment claim, much less the "further showing" that would be required to prove constructively discharge. Suders, 542 U.S. at 143, 147. As to the deliberateness element, Dal-Tile responded quickly to Freeman's complaint, took steps to ensure the conduct she complained of would end, and communicated the outcome to her.

1895375.1

These facts do not suggest that anyone at Dal-Tile deliberately forced Freeman to quit; to the contrary, the record reflects that Dal-Tile contemplated her ongoing employment when it informed her of her job reclassification, scheduled work hours, and Koester's termination from VoStone. *See* <u>Pickworth v. Entrepreneurs' Organization</u>, 2008 WL 110925, at *1 (4th Cir. 2008).

Freeman's assertion that her depression and anxiety prompted her resignation also does not suffice to show constructive discharge. She presents no medical evidence establishing that these health conditions existed at the time of her resignation, that they persisted as a result of Koester's allegedly offensive behavior (which had ended months before), or the remote possibility that, notwithstanding Koester's termination from VoStone and the ongoing "no contact" restrictions put in place by Dal-Tile, his inappropriate conduct might recur. Nor does Freeman present any medical evidence indicating that, by December 7, 2009, her health had deteriorated to the point where she was compelled to quit her job. For these reasons, her constructive discharge claim fails as a matter of law. *See* <u>Pyatt v. Harvest Hope Food Bank</u>, 2012 WL 1098632, at *4 (D. S.C. 2012).

## III.   Freeman cannot establish the essential elements of a retaliation claim.

The Court should analyze Freeman's retaliation claim using the familiar <u>McDonnell Douglas</u> burden-shifting proof scheme. <u>Causey v. Balog</u>, 162 F.3d 795, 803 (4th Cir. 1998); *see also* <u>Jordan v. Alt. Res. Corp.</u>, 458 F.3d 332, 343-44 (4th Cir. 2006) (retaliation claims under Title VII and Section 1981 involve same standards of liability). The plaintiff first must establish a prima facie case of discrimination by showing (1) the plaintiff engaged in protected activity; (2) a materially adverse action occurred; and (3) there was a causal connection between the protected activity and the materially adverse action. <u>Burlington Northern & Santa Fe Rwy. v. White</u>, 548 U.S. 53, 68-69 (2006). Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged. <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133 (2000). If the defendant meets this burden, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

21

## A.     No Protected Activity

Freeman claims that Dal-Tile retaliated against her for making internal complaints about Koester's behavior.[9] Am. Compl. ¶76 [Doc. 55]. An employee only engages in protected activity if she opposes an actual unlawful employment practice or an employment practice that the employee reasonably believes to be unlawful. Jordan, 458 at 338. Whether an employee reasonably believes a practice to be unlawful should be determined using an objective standard. Id. The only conceivable unlawful employment practice that Freeman could have been opposing under Section 1981 was a racially hostile work environment created by Koester's "black bitch" and "nigger's checkbook" remarks.[10] As described previously in this Memorandum, these isolated statements simply do not constitute an actionable hostile work environment and, under the objective standard which must be applied, Freeman could not reasonably have perceived them as such.

Moreover, even if a hostile work environment did exist or it was reasonable for Freeman to believe that one existed, Freeman's retaliation claim still fails because there is no basis for imputing liability for Koester's remarks to Dal-Tile. To prove that she engaged in protected opposition activities, Freeman's opposition "must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual" like Koester. Folkerson v. Circus Circus Enterprises, 107 F.3d 754, 756 (9th Cir. 1997) (quoting Silver v. KCA, 586 F.2d 138, 141 (9th Cir. 1978)). Consequently, "[t]o satisfy the first element of a prima facie case of retaliation, [plaintiff] must show sufficient facts to impute the actions of [a customer] to the employer." Tawwaab, 729 F. Supp.2d at 773 (quoting Folkerson, 107 F.3d at 756). As described above, Freeman can present no legitimate basis for imputing Koester's alleged harassment to Dal-Tile and, as a result, cannot demonstrate that she engaged in protected activity. Id.

---

[9] Freeman does not claim Dal-Tile retaliated against her for filing an EEOC charge. At any rate, Dal-Tile decided to implement the allegedly retaliatory job reclassification *before* it received notice of Freeman's charge. Diksa Aff. ¶40. Thus, Freeman cannot establish the requisite causal link between her EEOC charge and the challenged employment action. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998).

[10] Freeman's EEOC charge contains no retaliation claim, Freeman Dep. 295, and she has brought her retaliation claim solely under Section 1981, which prohibits harassment based on race—not Title VII, which prohibits harassment based on both race and sex. [Doc. 55].

1895375.1

## B.     No Materially Adverse Action

In <u>Burlington Northern</u>, the Supreme Court made clear that anti-retaliation provisions "protect an individual from not all retaliation, but from retaliation that produces an injury or harm." <u>Burlington Northern</u>, 548 U.S. at 67.   Thus, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." <u>Id</u>.   Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Id</u>. at 68. Although <u>Burlington Northern</u> was decided in the Title VII context, this Court has applied its adverse employment action standard to claims arising under Section 1981.   <i>See</i> <u>Barcliff v. N.C. League of Municipalities</u>, 2011 WL 3290578, fn. 3 (E.D.N.C. 2011).

Freeman has alleged that her job reclassification following her leave of absence constituted a retaliatory demotion.   However, she has presented no evidence suggesting that this reclassification harmed her in any material way.   <i>See</i> <u>Csicsmann v. Sallada</u>, 2006 WL 3611729, at *4 (4th Cir. 2006) (no adverse action existed based on job reassignment where the plaintiff offered only evidence of intangible alleged harms related to his preference for his previous position).   Although she points out that, after the reclassification, she was no longer enrolled in the Sales Consultant Incentive Program, she offers no evidence showing that she would have earned any points, much less enough points to redeem for a prize, in the brief period of time she worked between her leave of absence and resignation three weeks later. Indeed, the only prizes that Freeman ever received under the rewards program (movie tickets and enough points for an MP3 player) were of merely nominal value and, more importantly, did not result from any inside sales activities on her part.   Instead, Freeman was awarded these prizes based on her completion of the on-line Sales Consultant training and certification process, the same as all other Sales Consultants who completed this initial phase of the process.   Consequently, her contention that she was harmed by no longer being able to participate in the rewards program is purely speculative and, in any event, does not amount to a showing of material harm.   <i>See</i> <u>Holland v. Washington Homes</u>, 487 F.3d 208, 219 (4th Cir.

23

2007) (speculation about future adverse consequences of an evaluation or reassignment does not constitute adverse employment action); *see also* Schamann v. O'Keefe, 314 F. Supp.2d 515, 531 (D. Md. 2004) (the non-receipt of a discretionary bonus does not constitute adverse employment action).

Freeman also testified that, following her July 30, 2009 complaint, she felt that Wrenn and her co-worker, Jodi Scott, "pretty much ostracized" her. Freeman Dep. 215-17, 293-96. According to Freeman, Wrenn did not visit her office as frequently as she did before, spoke to her in a harsh manner, stopped asking if she wanted anything for lunch, stopped going outside for cigarette breaks with her, and no longer showed her "any type of concern." *Id*. According to Freeman, she felt like she was no longer "part of the team" and was "walking on eggshells." *Id*. at 295-296.

None of this perceived conduct, even if it were true, amounts to anything more than petty slights and would not deter a reasonable person from complaining about discrimination. This Court and others have determined that actions more concretely detrimental than those at issue here fall short of materially adverse under the Burlington standard. *See* Tepperwein v. Entergy Nuclear Operations, 663 F.3d 556, 568 (2d Cir. 2011) (no materially adverse action where employer investigated the plaintiff three times for alleged misconduct, counseled him, threatened to discharge him twice and forced him to switch from day to night shift); Quinn v. St. Louis County, 653 F.3d 745, 751-52 (8th Cir. 2011) (no actionable employment action where the plaintiff's office was moved, she was excluded from meetings, she lost job responsibilities, and her new boss—formerly the attorney who represented the employer regarding her discrimination charges—called her a "problem employee," yelled at her and unfairly accused her of turning work in late); Fercello v. County of Ramsey, 612 F.3d 1069, 1078-79 (8th Cir. 2010) (reassigning the plaintiff's parking space, moving her to less desirable office and excluding her from meetings are petty slights and not materially adverse); Johnson v. Weld County, 594 F.3d 1202, 1216-17(10th Cir. 2010) (no materially adverse action where, after her complaints, the plaintiff got the "cold shoulder" and her supervisors sat farther away from her at meetings, became too busy to answer her questions and tried to avoid her); McCullough v. Kirkum, 2006 WL 3786043, at *3 (5th Cir. 2006) (relocation to another desk and vague negative comments by co-workers not actionable); Holley v. N.C. Dep't of Admin., --- F.

Supp.2d ---, 2012 WL 441175, at *24 (E.D.N.C. 2012) (heightened scrutiny of the plaintiff's work, inconsistent reviews of her work, and unnecessary delays in approving her work and consequent damage to her relationships with end users and vendors did not amount to materially adverse action); Rose, 2006 WL 173690, fn. 3 (supervisors' actions in not talking to the plaintiff, failing to discipline users of profanity in the workplace and failing to support her on disciplinary measures not materially adverse).

### C. No Pretext Regarding Dal-Tile's Legitimate Non-Discriminatory Reasons

Dal-Tile has presented legitimate, non-discriminatory reasons for its decision to reclassify Freeman as a Customer Service Representative in November 2009—specifically, the newly created Sales Consultant position was not working well in the Raleigh Stoneyard where, due to the nature of the business, there were simply not enough unassigned house accounts for Freeman to handle in her inside sales role. Diksa Aff. ¶¶16-17. Importantly, when Freeman was removed from the Sales Consultant position, she was not replaced by anyone else, nor did any other person at the store assume the Sales Consultant job or become eligible to enroll in the Sales Consultant Incentive Program. *Id*. at ¶16. This was consistent with the removal of the Sales Consultant position from other Dal-Tile sales service centers where the inside sales role did not work out. *Id*. at ¶¶15, 18. In fact, in November 2009—the very same month in which Freeman was reclassified—a Caucasian male employee, Mark Haddon, also was reclassified from Sales Consultant to Customer Service Representative when the inside sales role was removed from the sales service center where he worked. *Id*. at ¶¶18-19, 41, Ex. F. The undisputed material facts show that Haddon had never complained of workplace harassment or engaged in any other legally protected activity. *Id*. at ¶41. Particularly given these facts, Freeman cannot establish that Dal-Tile's reasons for reclassifying her job were a mere pretext for unlawful retaliation. *See* People v. Marjack Co., Inc., 2010 WL 889567, at *11 (D. Md. 2010).

### IV. Freeman cannot establish a claim for common law civil obstruction of justice.

In order to establish a claim for common law obstruction of justice, a plaintiff must show some "action *intentionally undertaken* by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy . . ." Blackburn v. Carbone, 703 S.E.2d 788, 795

25

(N.C. App. 2010) (emphasis added). *See, e.g.*, <u>Earp v. Quinlan</u>, 698 S.E.2d 556, 2010 WL 3001521, at *7 (N.C. App. 2010) (reversing trial court's Rule 12(b)(6) motion to dismiss, given allegations that employer intentionally tampered with evidence by altering or removing targeted internet history, specific files, and altering contents of a particular computer, which evidence was central to employee's wrongful discharge claim); <u>Grant v. High Point Reg'l Health Sys.</u>, 184 N.C. App. 250, 255-56, 645 S.E.2d 851, 855 (2007) (holding that plaintiff executrix stated claim for obstruction of justice based on allegations that hospital destroyed specific x-ray film of decedent (after receiving letter from attorney regarding potential malpractice), which effectively precluded plaintiff from obtaining the requisite Rule 9(j) certification and prosecuting a medical malpractice claim).

Here, as set forth in the Amended Complaint, Freeman's allegations are based solely on Dal-Tile's failure to preserve all electronically stored information, including e-mails from June 2008 to December 2009, after receiving notice of plaintiff's internal complaint and her EEOC charge, *neither of which mentioned anything about e-mails*. *See* Amend. Compl. ¶¶ 89-92 [Doc. 55].

As will be outlined below, to establish her civil obstruction of justice claim, Freeman must show that relevant e-mails (or documents) actually existed and were intentionally destroyed by Dal-Tile, and that this harmed her case in some way. But, all Freeman has been able to show in this case is that e-mails were not preserved for a period of time. Plaintiff simply speculates that 1) there may have been relevant e-mails that no longer exist; 2) these "hypothetical e-mails" would have in some way helped her case; and 3) Dal-Tile should be liable for intentionally wrongful conduct in not preserving them. Plaintiff's allegations are woefully inadequate. As will be shown below, Freeman's civil obstruction of justice claim fails for two reasons: (1) there is no evidence that Dal-Tile intentionally undertook action to obstruct justice and (2) Freeman has not been impeded or hindered in prosecuting her claims in this action.

**A. Freeman has not forecasted any evidence that Dal-Tile intentionally undertook action to obstruct justice.**

The North Carolina Court of Appeals' decision in <u>Earp</u> is particularly instructive for demonstrating that Freeman has not established the type of intentional conduct actionable through a civil

obstruction of justice claim. In <u>Earp</u>, the plaintiff employee alleged, in her second lawsuit, that the defendant owner had attempted to delete certain pornographic images on a company computer that were at the very core of her wrongful discharge claim against the company (she had previously complained about another employee using the computer to access those very images). In her first lawsuit, her computer expert had examined the hard drive from the computer and determined that pornographic images had, in fact, been viewed on the computer, but that someone had attempted to delete them on at least two separate occasions. <u>Earp</u>, 2010 WL 3001521, at *2. On these facts, the North Carolina Court of Appeals held that the trial court erred in dismissing the plaintiff's civil obstruction of justice claim at the 12(b)(6) phase of the proceedings. <u>Id</u>. at *7.

Similarly, cases decided within the Fourth Circuit have required some showing of conduct targeted at a particular individual to prevent him or her from proceeding with a legal claim in order to establish obstruction of justice. For example, in <u>Reed v. Buckeye Fire Equip</u>., 241 Fed. Appx. 917, 2007 WL 2173616 (4th Cir. 2007) the Court reversed the trial court's grant of summary judgment, finding genuine issues of material fact as to whether the employer's co-owner blackmailed the plaintiff by threatening to reveal compromising romantic correspondence between the plaintiff and another woman to plaintiff's wife if the plaintiff proceeded with his FMLA and wrongful discharge lawsuit). <u>Id</u>. at 928, 2007 WL 2173616, at *10. Likewise, in <u>Jackson v. Blue Dolphin Communications of N.C</u>., 226 F. Supp.2d 785 (W.D.N.C. 2002), the Court denied the defendants' motion to dismiss the plaintiff's obstruction claim that included allegations that the defendants fired her after she refused to sign a false affidavit that would have later been used in a civil suit filed by one of plaintiff's co-employees. Notably, the Court found that the plaintiff had standing to bring her obstruction of justice claim even though the affidavit was not going to be used against her, but against one of her colleagues. <u>Id</u>. at 794.

Here, the facts as forecasted by Freeman are a far cry from the alleged intentional tampering and altering of files by the employer in <u>Earp</u>, the blackmail attempt in <u>Reed</u>, or the attempted false affidavit in <u>Jackson</u>. Dal-Tile submits there has been no wrongful conduct that would give rise to any remedy for Freeman. That said, Freeman's claim for civil obstruction of justice is, at best, a repackaged spoliation of

evidence argument—which the Fourth Circuit has recognized is not a separate and distinct claim for relief, but merely a discretionary evidentiary doctrine. *See* <u>Silvestri v. General Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir. 2001) (noting that "while spoliation of evidence may give rise to court imposed sanctions deriving from this inherent power [to control the judicial process and litigation], the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses"). Dal-Tile has consistently stated throughout its discovery responses[11] that it has no e-mails from this time frame. There is no evidence (nor does plaintiff contend) that Freeman's e-mails (or others') in particular were singled out to be deleted or altered similar to the employer's conduct alleged in <u>Earp</u>. In fact, there is no evidence showing that anyone at Dal-Tile took any intentional act with respect to the destruction of any e-mails. Indeed, the undisputed facts show (as described in more detail below) that Dal-Tile took steps to preserve documents relevant to Freeman's internal complaint, and actually produced relevant e-mails (in printed form) during the relevant time period. These facts wholly negate any allegations that Dal-Tile attempted to obstruct justice. As such, Freeman's claim fails.

### B. Freeman has not been impeded or hindered in prosecuting her claims in this action.

Even assuming *arguendo* that Freeman could establish the requisite level of intentional conduct for an obstruction claim (which she cannot), she has not been damaged by Dal-Tile's failure to preserve "all e-mail messages from the period of June 2008 through December 2009." Amend. Compl. ¶90. Freeman's claim is negated by the fact that Dal-Tile actually did preserve key relevant documents— including print-outs of pertinent e-mails—that were generated in the normal course of its investigation of plaintiff's internal harassment complaint.[12] *See, e.g.,* Diksa Aff. Exs. H, I, J, N. Given the undisputed

---

[11] *See* Defendant's Responses to Plaintiff's First Requests for Production of Documents with Accompanying Interrogatories and Defendant's Responses to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents, which are included in the Appendix to Defendant's Motion for Summary Judgment.

[12] As further explained in Dal-Tile's answer to interrogatory number 3 in Freeman's second set of discovery requests, a formal litigation hold notice was issued later, on August 2, 2010, as a result of internal audit performed around the time of the consolidation of the legal departments between Dal-Tile and Mohawk. As a practical matter, this hold notice simply resulted in the internal investigation file being maintained as it was. Diksa Dep. 45-49.

facts of Freeman's harassment claims, any other e-mails either (1) to or from Koester or (2) pertaining to Freeman's internal complaint[13] about Koester, would not in any way affect the merits of this case.

With respect to Koester's e-mails, while it is true that Dal-Tile did not stop the automatic deletion of every e-mail that may have been sent to or received from Koester—an outside, third-party customer representative—its decision not to do so can be explained by a very simple reason: *Freeman never complained about any e-mails Koester sent her.* As described above, at no stage of this litigation—internally, at the EEOC stage, in the pleadings filed in this litigation—has Freeman ever alleged that Koester harassed her through e-mail, or any other written form for that matter; her complaints have only dealt with sporadic oral statements made by Koester. Also, Freeman herself retained a copy of an August 28, 2009 e-mail sent from Koester to her regarding a customer (Wiggins) cancelling a visit to Dal-Tile. [Doc. 55-2]. Furthermore, in her deposition, Freeman could not point to any other communications from Koester, aside from what the parties produced during discovery. Freeman Dep. 196, 245, 249-50, 274-75. Thus, unlike the pornographic images directly at issue in <u>Earp</u>, Freeman can only speculate about the possible relevance of any additional e-mails that may or may not have been sent to or received from Koester, or even about *the very existence* of any such e-mails. *Compare* <u>Powell v. Town of Sharpsburg</u>, 591 F.Supp.2d 814, 817-18 (E.D.N.C. 2008) (holding, in spoliation of evidence context, that defendant's destruction of work orders that plaintiff employee was accused of not performing and that were issued to him within two weeks prior to his termination were relevant to Title VII discrimination claim, as "evidence revealing as a pretext plaintiff's alleged refusal to complete work orders could constitute evidence of discrimination against him").

Any additional e-mails exchanged between Dal-Tile management employees pertaining to Freeman's complaint about Koester likewise do not in any way impede Freeman's claims. Like the August 28, 2009 e-mail from Koester referenced above, Freeman herself retained copies of e-mails she exchanged with Diksa and Holland that were not part of Diksa's investigative file. [Docs. 51-2, 51-4, and

---

[13] No evidence has been forecasted that any Dal-Tile employee other than Freeman ever made a harassment complaint against Koester. *See* Diksa Dep. 40.

1895375.1

51-5]. From the forecasted evidence, the only e-mails between members of Dal-Tile's management that were not preserved in some form or another were e-mails from Craig Belden, Operations Manager, to Diksa. As explained during his deposition, Belden forwarded e-mails from Freeman's account to Diksa— at Diksa's direction—that he thought might pertain to Koester, based on the subject and sender of the e-mail. Belden Dep. 10-21. Belden indicated that he did not recall anything significant about the e-mails that he forwarded. *Id.* at 16. Although Dal-Tile did not preserve these e-mail forwards (which may have been duplicative of e-mails that Diksa already had), the very fact that Diksa instructed Belden to forward such e-mails to her—as opposed to instructing him to destroy or delete them—goes to further negate any intent to obstruct justice on Dal-Tile's part. Overall, as described above, Freeman cannot credibly dispute the material facts surrounding the remedial actions taken by Dal-Tile in response to Freeman's complaint or, for that matter, the effectiveness of those actions; Freeman concedes that Koester did not harass her after July 29, 2009. Freeman Dep. 196, 245, 249-50, 274-75. The presence of additional e-mails (assuming such e-mails ever existed) that might discuss Freeman's complaint, or Dal-Tile's potential resolution of the same, does not change this analysis.

In short, Freeman's sole complaints have been about oral comments made by Koester. Following her complaint, Dal-Tile took prompt remedial action to end the possibility of any further inappropriate comments or conduct by Koester. Freeman has presented no evidence whatsoever that any further comments or any other type of inappropriate behavior continued as to Koester. As such, any alleged destruction of documents are irrelevant to the issue at hand and are mere speculation and conjecture on behalf of Freeman that any alleged documents no longer in existence go to the heart of Freeman's complaint, Koester's alleged harassment, and Dal-Tile's actions to put an end to the same.

## CONCLUSION

As described herein, Dal-Tile has established that no genuine issue exists as to any material fact and that it is entitled to judgment as a matter of law on all of Freeman's claims. Accordingly, the Court should grant summary judgment in Dal-Tile's favor and dismiss Freeman's claims in their entirety.

This the 30th day of May, 2012.

<div style="margin-left:40%">

**/s/ Kristine M. Sims**
NC State Bar No. 26903
E-mail: ksims@constangy.com
**/s/ William J. McMahon, IV**
NC State Bar No. 34097
E-mail: bmcmahon@constangy.com
CONSTANGY, BROOKS & SMITH, LLP
100 N. Cherry Street, Suite 300
Winston-Salem, NC 27101
Telephone: 336-721-1001
Facsimile: 336-748-9112
L.R. 83.1 Counsel

**/s/ Timothy R. Newton**
Georgia Bar No. 5442200
CONSTANGY, BROOKS & SMITH, LLP
230 Peachtree Street, N.W.
Suite 2400
Atlanta, Georgia 30303
Phone: 404-525-8622
Facsimile: 404-525-6955
E-mail: tnewton@constangy.com

</div>

31

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2012, I electronically filed the **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Laura J. Wetsch** (lwetsch@winslow-wetsch.com), **Joshua Friedman, Daniela Nanau and Rebecca J. Houlding** (rebecca@joshuafriedmanesq.com), Giselle Brianceschi Schuetz (giselle@joshuafriedmanesq.com) and **Dominique N. Ferrera** (dominique@joshuafriedmanesq.com) and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: **none.**


/s/ **Kristine M. Sims**
N.C. State Bar No. 26903
E-mail:ksims@constangy.com
CONSTANGY, BROOKS & SMITH, LLP
100 North Cherry Street, Suite 300
Winston-Salem, NC 27101
Telephone: (336) 721-1001
Facsimile: (336) 748-9112
L.R. 83.1 Counsel

1895375.1