UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| LORI FREEMAN, | ) | Civil Action No. 5:10 CV 522 BR |
|     Plaintiff, | ) | |
| | ) | **REPLY MEMORANDUM IN** |
| v. | ) | **SUPPORT OF DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| DAL-TILE CORPORATION, | ) | **JUDGMENT** |
|     Defendant. | ) | |

To successfully oppose Dal-Tile's summary judgment motion, Plaintiff was required to come forward with specific evidence substantiating her claims. Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In her response, Plaintiff abandoned her retaliation claim and only addressed her claims of hostile work environment, constructive discharge and civil obstruction. As to those claims, Plaintiff failed to identify specific facts showing that a genuine issue exists for trial.

**I.    Dal-Tile is entitled to summary judgment on Plaintiff's abandoned retaliation claim.**

Plaintiff has not addressed in any manner Dal-Tile's summary judgment argument regarding her retaliation claim under Section 1981. By failing to respond to this argument, Plaintiff has abandoned any such claim. Ferdinand-Davenport v. The Children's Guild, 742 F. Supp.2d 772, 777 (D. Md. 2010).

**II.    The Court should disregard Plaintiff's unsubstantiated assertions of "fact."**

Plaintiff has made numerous assertions that are not substantiated by the record. The Court must disregard plaintiff's baseless contentions, some of the most egregious of which are described below.[1] Fed. R. Civ. P. 56(c); Rountree v. Fairfax County Sch. Bd., 933 F.2d 219, 223 (4th Cir. 1991).

    **A.    Plaintiff's Exaggerated Statements Regarding the Alleged Harassment**

Plaintiff has failed to clearly delineate her allegations of harassment and cite evidence substantiating her assertions. Instead, she has exaggerated her claims and cobbled together excerpts from various depositions, without regard to the context of the testimony. For instance, Plaintiff begins her

---

[1] Dal-Tile cannot address in this 10-page reply all of Plaintiff's unsubstantiated assertions and misstatements throughout her 40-plus-page submission—including substantial 10-point font footnotes.

1

description of Koester's conduct with a sweeping statement that her manager, co-workers and Koester himself all testified that Koester "regularly and frequently made inappropriate sexual and racial remarks."

In support of her broad assertion, Plaintiff first misquotes Jodi Scott's testimony for the proposition that Koester made racial jokes or remarks every day. Scott actually testified as follows:

> Q. How often did you hear Tim make racial jokes or comments?
> A. Since the day I started there, every day. I mean, every day he came in. I mean, it was a very common practice when he came in, and it wasn't—when I say "racial," I want to clarify, okay. I think of racial, as far as the slang that you are using … I'm not saying somebody using the N word or anything like that. I am saying racial, as far as their slang, okay. So I want to clarify that.

Scott Dep. 17. Scott further explained that, by "racial slang," she meant that Koester engaged in "back and forth" with Plaintiff or others, using "inner city talking" such as "Yo, yo," "Yo, bitch," or "What's up?" Id. at 13-14, 18-21, 25, 27-28, 30-31. As to the alleged sexual comments, Scott testified that Koester at times mentioned that women (including her daughters) were "hot" or "good looking," but she also stated, "I wouldn't say it was inappropriate." Id. at 11; *see also* id. at 12-13. Scott also testified that she encountered Koester "maybe once or twice every two weeks," not daily as Plaintiff claimed. Id. at 9.

Scott was the sole co-worker quoted in support of Plaintiff's contention that her "coworkers" (plural) testified that Koester "regularly and frequently made inappropriate sexual and racial comments." The only other coworker testimony mentioned in the "Statement of Facts" was that of Patrick Suggs, and Plaintiff's description of that testimony is also misleading. Plaintiff stated that Suggs, a warehouse employee, interacted with Koester less frequently than employees in the office, yet Suggs testified that he interacted with Koester one to three times a week, far more frequently than Plaintiff's office-mate Scott, as described above. Suggs Dep. 8; Scott Dep. 9. Suggs did testify that he had heard Koester use the word "bitches," but "not often," and he never saw Koester show pictures of women, and never heard him tell sexual jokes, make racial remarks, or say anything Suggs felt was inappropriate. Suggs Dep. 8-9, 16.

As to her assertion that Koester testified that he "regularly and frequently made inappropriate sexual and racial comments," Plaintiff quotes Koester's declaration, stating that he had made racial comments and/or racial jokes when visiting the Stoneyard, and the following deposition testimony:

> Q. Did you ever make any comments to Lori that you thought—that you meant to be intentionally hurtful to her?
> A. No, never. Did I make a lot of comments that I shouldn't have said. Yes. But were they meant to be hurtful to her? Absolutely not. I don't have that in me. I don't hurt people.

Koester Dep. 41-42. These unrelated statements, even combined, do not support Plaintiff's assertion.[2]

Plaintiff's contention that Wrenn testified that Koester "regularly and frequently made inappropriate sexual and racial comments" is likewise unfounded. Plaintiff cites Wrenn's testimony that Koester made comments about women and seemed to enjoy women, which does not indicate that these comments were inappropriate. Holland Dep. 21-22. According to Plaintiff, Wrenn testified that she "assumed" Koester made racial jokes, but the portion of Wrenn's testimony cited by plaintiff actually shows that Wrenn could not recall a single time Koester had ever made a racial joke. Id. at 20.

Finally, Plaintiff cites her own generalized testimony that she was "always" being subjected to "some sort of lewd comments" by Koester.[3] Plaintiff, however, has provided no specifics about this alleged inappropriate conduct, apart from the six incidents described below:[4]

| Aug-Sept 2006 | Plaintiff overheard Koester as he walked into Wrenn's office and, referencing a photograph of two former employees, asked, "Who are these two black bitches?" Freeman Dep. 107-10, 122-24. |
|---|---|
| Jul-Aug 2008 | Koester used Plaintiff's phone to talk with a VoStone employee and, as the call ended, he said, "Hey Zack," placed the receiver near his buttocks and passed gas, and then laughed and handed the phone back to Plaintiff. Id. at 117-18. |

---

[2] Later in her memorandum, Plaintiff asserted that Koester "often" focused on black women, citing his testimony that he "probably" had made comments about beautiful black women he had taken home. As the context makes clear, Koester merely postulated that he might have made such comments and, contrary to plaintiff's contention that he "volunteered" information about his sexual escapades, he was responding to questions about whether he had dated "black girls." Koester Dep. 50-51.

[3] Plaintiff references other conduct she did not witness—namely, Koester showed Wrenn ("a couple of times," "not often") jokes on his phone with pictures of naked women. Holland Dep. 18-19.

[4] Plaintiff mentioned, in a footnote, that Koester once remarked, after Obama was elected, "You guys won." Koester testified that he made this comment, as a staunch Republican, because he knew Freeman supported Obama—not because of her race. Koester Dep. 25-26, 51-52.

3

| | |
|---|---|
| June 3, 2009 | Koester called Plaintiff about a customer appointment and stated, "Lori I'm so fucked up I did so much coke and popped all kinds of pills, I'm so fucked up, Lori, don't take offense, but I'm as fucked up as a Nigger's checkbook." <u>Id.</u> at 125-27, 136-45. |
| July 29, 2009 | While he was on the phone with Plaintiff, Koester's daughter asked, "Daddy, who's that?"; he replied, "That's the black bitch over at Marble Point." <u>Id.</u> at. 151-54, 194-96. |
| Unspecified Time Frame | Plaintiff overheard Koester talking with Scott about photographs of Scott's daughters and saying, "I'm going to hook up with one of your daughters" or "I'm going to turn your daughters out." <u>Id</u>. at. 206-07. |
| Unspecified Time Frame | Koester commented about women he had been with and once showed Plaintiff a photograph of a naked woman on his cell phone and said this was what he had left in his bed that morning. <u>Id.</u> at. 115-16. |

To bolster these rather slim allegations, Plaintiff relies heavily on her testimony that Koester made other racial or sexual comments that she cannot recall. She claims, without citing any authority, that her failure to identify "each and every" incident is "irrelevant." This off-handed assertion shows that plaintiff has fundamentally misapprehended her burden. To successfully oppose summary judgment, Plaintiff must present "specific facts" showing that a genuine issue of fact exists. <u>Anderson</u>, 477 U.S. at 248. Allegations of inappropriate behavior that are "[un]substantiated by accounts of specific dates, times or circumstances" are too general to create a fact issue. <u>Carter v. Ball</u>, 33 F.3d 450, 461-62 (4th Cir. 1994); s*ee also* <u>Ladd v. Grand Trunk W. R.R.</u>, 552 F.3d 495, 501 (6th Cir. 2009) (plaintiff's total lack of specificity regarding the alleged harassment, apart from a handful of remarks, prevents analysis of its pervasiveness or severity); <u>Gilliam v. S.C. Dep't of Juvenile Justice</u>, 474 F.3d 134, 142-43 (4th Cir. 2007) (generalized assertions insufficient); <u>Causey v. Balog</u>, 162 F.3d 795, 801 (4th Cir. 1998) (conclusory statements, without specific evidentiary support, cannot support actionable harassment claim).

Plaintiff's cavalier approach to the "facts" is further illustrated by her list, in the "Argument" section of her memorandum, of 16 quotations regarding Koester's alleged conduct, without any citations

4

to the record or even, in all but four instances, any indication of which witness made each of the statements. After one of the quotations, Plaintiff even described Koester as an "admitted harasser," although neither Dal-Tile nor Koester ever admitted anything of the sort.

### B. Plaintiff's Unsubstantiated Statements Regarding Dal-Tile's Remedial Measures

Plaintiff has materially misconstrued the record evidence regarding Dal-Tile's remedial measures taken in response to her complaint to HR. First, Plaintiff incorrectly contends that Dal-Tile has "obscured" the facts concerning when Diksa learned of Plaintiff's complaint. During Diksa's deposition, Dal-Tile discovered and produced her July 30, 2009 notes, which had previously been overlooked. At that point, plaintiff had (and took) the opportunity to question Diksa about her notes and the timeline of events. Diksa Dep. 52-53, 71-75. Moreover, in stating the facts in the light most favorable to plaintiff, Dal-Tile's opening brief cited Plaintiff's testimony for the proposition that the complaint was made to Diksa on July 30, 2009. Clearly, Dal-Tile's actions did not impede discovery or "obscure" the facts.

In describing Dal-Tile's remedial measures, Plaintiff misstates the facts in numerous important respects. For example, Plaintiff states that, on August 12, 2009, Marco Izzi sent Dal-Tile a letter acknowledging that there had been several instances on which Koester had verbally abused Plaintiff. Izzi's e-mail of that date, however, merely acknowledged the substance of Plaintiff's complaint—not that the conduct had occurred. Diksa Dep. 28-29, Ex. 4. Plaintiff asserts that Izzi's communication shows that Dal-Tile "had not taken any official action," yet Izzi's e-mail affirms that Dal-Tile had already "communicated to [VoStone] that Tim … is not [sic] longer welcome to visit [Dal-Tile's] premises." Id. In his e-mail, Izzi challenged that decision and requested reconsideration. Id. Consequently, Maslowski, Izzi and Plaintiff met on August 18 to discuss potential alternatives. Maslowski Dep. 20-25; Izzi Dep. 18-23. Plaintiff characterized that meeting as an attempt by Dal-Tile and Izzi to "pressure" her to continue working with Koester, but her own testimony shows only that Izzi (not anyone from Dal-Tile) asked whether a public apology from Koester would suffice, and Plaintiff replied, "Absolutely not." Freeman Dep. 219-21. As Dal-Tile's subsequent letter to Izzi made clear, Dal-Tile restricted Koester from contacting Plaintiff for six months. Diksa Dep. 10-11, 30-32, Ex. 1, DALTILE00101; Izzi Dep. 27.

5

Plaintiff attempts to dispute that any such restriction was put in place, claiming that Dal-Tile improperly cited pages 10-11 of Diksa's deposition which contains no reference to this decision. That portion of the deposition, however, authenticates Ex. 1, Diksa's notes which describe the decision to suspend Koester, as required to comply with Rule 56(c), Fed. R. Civ. P. (a requirement which Plaintiff liberally ignored in her submission). Moreover, Dal-Tile also cited pages 30-32 of Diksa's deposition testimony, along with pages 27-28 of Maslowski's deposition and page 53 of Koester's deposition, all of which substantiate Dal-Tile's assertion regarding its remedial measures. *See also* Holland Dep. 31-33.

Plaintiff also creates the false impression that Wrenn scheduled Koester's visit on August 31, 2009, without regard to whether Plaintiff would be there. In actuality, Wrenn first called Plaintiff to ask when she would be going to lunch and, after Plaintiff said she would be leaving at noon, Wrenn scheduled Koester's visit to coincide with Plaintiff's absence. Freeman Dep. 239-40; Holland Dep. 52-53. It was only after Plaintiff learned that Koester was coming that she told Wrenn she would not leave for lunch after all. Id. At that point, Wrenn had already told Koester he could come. Id.

Among the most glaring of Plaintiff's misrepresentations is her assertion that Koester's sexually and racially offensive statements continued "all throughout Plaintiff's employment," when the record evidence (including Plaintiff's own testimony) demonstrates that is not the case. Plaintiff unequivocally affirmed that she had no interactions with Koester following her complaint to Diksa on July 30, 2009, aside from two innocuous communications regarding a customer matter. Freeman Dep. 232-37, 245-50, 273-75, Ex. 13. Given this undisputed testimony, Plaintiff cannot credibly contend that Dal-Tile did not actually take the remedial measures described in its opening memorandum or, for that matter, that these measures were anything less than effective in ending the alleged harassment.

**III. Insufficient evidence to establish genuine issue of fact on hostile work environment claims.**
    **A. No Showing of Severe or Pervasive Conduct Based on Race/Gender**

Plaintiff begins her argument by selectively quoting Mosby-Grant, in which the Fourth Circuit ruled that the plaintiff, the sole female recruit at a police academy, had forecast sufficient evidence to show that the alleged harassment was severe or pervasive enough for her to prevail on her sex-based

hostile work environment claim, but not her race-based claim. Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 335 (4th Cir. 2010). Initially, Plaintiff quotes Mosby-Grant for the proposition that whether harassment is sufficiently severe or pervasive is "quintessentially a question of fact," but ignores the next line of the opinion: "Nonetheless, Title VII does not create a general civility code in the workplace; it only proscribes behavior that is so objectively offensive as to alter the conditions of the victim's employment." Id. (internal quotations omitted). She later contends that "racial and sexual harassment may be aggregated," again quoting Mosby-Grant, but omits the court's ultimate conclusion, which demonstrates that the two claims must be analyzed separately: "Nevertheless, there are now two distinct counts before us [of sex- and race-based harassment], and the evidence of the pervasiveness or severity of racial animus at the Academy is too isolated and too minimal to survive summary judgment." Id. at 337. If anything, Mosby-Grant demonstrates the propriety of granting summary judgment when the plaintiff lacks sufficient evidence to prevail. Id. at 330-37 (classmate's conduct in telling biracial recruit, "[w]here I'm from, people like you are strung up from a flagpole" and making comment about the recruit "being dragged from the back of a truck," combined with racial remarks made by other classmates, including the terms "honky," cracker," "white trash," "ghetto," and "fucking Mexicans," were insufficient); *see also* Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1083 (8th Cir. 2010) (internal quotations omitted).

Here, Koester's alleged conduct was not particularly severe, did not involve threats or intimidation, and can only be considered non-actionable, "mere offensive utterances." Unlike most of the cases cited by Plaintiff, the alleged harasser was merely a customer—not a supervisor authorized to take job-related actions. Faragher v. City of Boca Raton, 524 U.S. 775, 800-01 (1998) ("supervisors have special authority enhancing their capacity to harass"). Although she now asserts that Koester's behavior caused her to take a leave of absence, Plaintiff testified that she went on medical leave because she "was sick from having to deal with the fact that Tim was allowed to come back" (after August 31, 2009, when Wrenn tried to arrange Koester's visit while Plaintiff was at lunch), Freeman Dep. 257-58, and not because of the alleged harassment which had ended a month before. Ultimately, the question is whether a reasonable person would have found the work environment objectively hostile or abusive, and Plaintiff

7

has failed to present specific facts meeting this standard. Id., 524 U.S. at 787.

### B. No Basis for Imputing Liability to Dal-Tile

In support of her contention that Dal-Tile should be held liable for Koester's actions, Plaintiff stresses that Wrenn was "clearly aware" of a hostile environment and therefore had a duty to address Koester's behavior, but failed to act. Plaintiff, however, grossly overstates the nature and frequency of the alleged harassment, as described above. She also ignores Wrenn's undisputed testimony about Plaintiff's interactions with Koester. As described more fully in Dal-Tile's opening memorandum, Wrenn knew Koester could be "crude and tactless," but Plaintiff nevertheless seemed to be friendly with him, and readily called him names (like "faggot," "mother fucker," "dick," "man whore"). Holland Dep. 14-17, 59-62, 72-73. Even Plaintiff admits that she was "friendly" with Koester, as long as he was not making lewd comments. Freeman Dep. 193. Given this background, Wrenn was not unreasonable in perceiving, prior to Plaintiff's complaint to HR, that Koester's behavior did not seriously trouble her.

Plaintiff has disregarded her own responsibility to take reasonable steps to prevent harassment and mitigate harm. Faragher, 524 U.S. at 806-07. According to Plaintiff, the harassment began in August-September 2006 and persisted on a regular basis for years,[5] yet for some inexplicable reason, she waited until July 30, 2009 to escalate a complaint to Diksa. Dal-Tile provided multiple avenues for employees to report misconduct, and a reasonable person in Plaintiff's position, realizing her initial complaints were ineffective, would not have waited three years to begin seeking a remedy elsewhere. Cross v. Prairie Meadows Racetrack and Casino, 615 F.3d 977, 983 (8th Cir. 2010) (internal quotation omitted). Her failure to complain to Diksa earlier is particularly baffling given Plaintiff's assertion that Wrenn seemed unconcerned about Koester's conduct. Id.

Once Plaintiff complained to HR, Dal-Tile took measures reasonably calculated to end the harassment, and by all accounts, Koester's conduct stopped. Dal-Tile was not required to ban Koester altogether, as plaintiff suggests. Sutherland v. Wal-Mart Stores, 632 F.3d 990, 995 (7th Cir. 2011).

---

[5] Plaintiff claims the harassment went on "for nearly four years," but she testified that it began, at the earliest, in August 2006 and did not recur after she complained to Diksa on July 30, 2009.

**IV.    Plaintiff has not presented sufficient evidence of constructive discharge.**

Plaintiff's constructive discharge claim hinges on her contention that, by requiring her to work at the Stoneyard when there was a possibility she might see Koester, Dal-Tile deliberately made the working conditions so intolerable that a reasonable person would have felt compelled to resign.  In yet another example of the hyperbole characteristic of her response, Plaintiff has made a strained attempt to analogize the instant facts to those in Parker v. D.R. Kincaid Chair Co., 2011 U.S. Dist. LEXIS 85601 (W.D.N.C. 2011), where the alleged harasser was rehired at a facility where he was to work in close proximity to the plaintiff, who had previously testified, at the employer's request, about the sexual harassment at an unemployment benefits hearing.  The morning the harasser returned to work, the plaintiff received word that he had started telling other employees about her testimony at the hearing and threatening that she "hasn't seen sexual harassment yet."  The plaintiff, who knew that the harasser had engaged in violent conduct at work, left because she did not feel safe, and she made the reasons for her departure clear to her employer.  In contrast, Plaintiff was not being asked to work with Koester at all (much less in close proximity), Koester had never threatened Plaintiff or engaged in any violence, and in fact, he had not engaged in any inappropriate conduct since Plaintiff complained to HR months previously.  Moreover, Plaintiff offered no explanation to Dal-Tile when she resigned.  When Plaintiff returned to work, Wrenn told her that Koester no longer worked for VoStone and, if he needed to purchase Dal-Tile products on behalf of another fabricator, he would contact Wrenn directly.  These facts do not substantiate, by any stretch of the imagination, that Plaintiff was constructively discharged.  Pa. State Police v. Suders, 542 U.S. 129, 143, 147 (2004).

**V.    Plaintiff cannot prevail on her obstruction of justice claim.**

Despite Plaintiff's best efforts to change the law to suit her purposes, the North Carolina Court of Appeals has made clear that action "*intentionally undertaken* by the defendant *for the purpose of obstructing, impeding or hindering the plaintiff's ability to seek and obtain a legal remedy* will suffice to suffice to support a claim for common law obstruction of justice." Blackburn v. Carbone, 208 N.C. App. 519, 527, 703 S.E.2d 788, 795 (2010) (emphasis added).  Nonetheless, citing Powell v. Town of

Sharpsburg, 591 F.Supp. 2d 814 (E.D.N.C. 2008), Plaintiff borrows the "willfulness" standard for when an adverse inference instruction can be given for spoliation of evidence—a discretionary discovery sanction—and argues that it somehow applies to her obstruction of justice claim. [Doc. 78 at 43]

Powell is a case involving the spoliation of evidence, not obstruction of justice. As the Fourth Circuit has stated, "while spoliation of evidence may give rise to court imposed sanctions deriving from this inherent power [to control the judicial process and litigation], the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses". Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). Plaintiff's attempt to water-down the intent element by applying spoliation principles is not supported by a single case actually involving an obstruction of justice claim. Plaintiff's response is devoid of any allegation that Dal-Tile specifically intended to interfere with her ability to bring a lawsuit—and for good reason: she has no factual evidence to support such a position. In fact, the conduct that Plaintiff claims is critical of from a preservation of evidence standpoint actually *contradicts* a deliberate attempt to obstruct, impede, or hinder Plaintiff's ability to bring her claims. For example, Craig Belden testified that he was asked by Diksa to copy pertinent emails and forward them to her—not delete or destroy them. Belden Dep. at 11-12. A litigation hold notice was eventually issued, on August 2, 2010, after Suzanne Alcocer, Assistant General Counsel for Mohawk Industries (Dal-Tile's parent company) performed an internal audit of pending legal matters for Dal-Tile at the time Mohawk and Dal-Tile's legal departments were being consolidated and discovered that there was not yet a hold in place with respect to Plaintiff's EEOC charge. [Doc. 45-3]. As a practical matter, this hold notice simply resulted in Diksa continuing to maintain the documents already in her investigation file. Diksa Dep. 45-49. There is no evidence that Diksa attempted to remove or destroy any documents once she received notice of the litigation hold. Simply put, Plaintiff has not and cannot provide evidence of the necessary intent by Dal-Tile to obstruct her ability to bring her instant claims, and as such the claim fails.

For all of the reasons stated above, and in its initial memorandum, Dal-Tile respectfully requests that its motion for summary judgment be granted as to all of Plaintiff's claims.

This the 30th day of November, 2012.

| | |
|---|---|
| **/s/ Kristine M. Sims** (L.R. 83.1 Counsel) | **/s/ Timothy R. Newton** |
| NC State Bar No. 26903 | Georgia Bar No. 5442200 |
| E-mail: ksims@constangy.com | CONSTANGY, BROOKS & SMITH, LLP |
| **/s/ William J. McMahon, IV** (L.R. 83.1 Counsel) | 230 Peachtree Street, N.W., Suite 2400 |
| NC State Bar No. 34097 | Atlanta, Georgia 30303 |
| E-mail: bmcmahon@constangy.com | Phone: 404-525-8622; Facsimile: 404-525-6955 |
| CONSTANGY, BROOKS & SMITH, LLP | E-mail: tnewton@constangy.com |
| 100 N. Cherry Street, Suite 300 | |
| Winston-Salem, NC 27101 | |
| Telephone: 336-721-1001; Facsimile: 336-748-9112 | |

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2012, I electronically filed the **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Laura J. Wetsch** (lwetsch@winslow-wetsch.com), **Joshua Friedman, Daniela Nanau and Rebecca J. Houlding** (rebecca@joshuafriedmanesq.com), Giselle Brianceschi Schuetz (giselle@joshuafriedmanesq.com) and **Dominique N. Ferrera** (dominique@joshuafriedmanesq.com) and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: **none.**

/s/ **Kristine M. Sims** (L.R. 83.1 Counsel)
N.C. State Bar No. 26903
E-mail: ksims@constangy.com
CONSTANGY, BROOKS & SMITH, LLP
100 North Cherry Street, Suite 300
Winston-Salem, NC 27101
Telephone: 336-721-1001; Facsimile: 336-748-9112