UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-522-BR

| | | |
|---|---|---|
| LORI FREEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DAL-TILE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the 30 May 2012 motion for summary judgment filed by defendant Dal-Tile Corporation ("Dal-Tile"). (DE # 60.) The motion has been fully briefed and is ripe for disposition.

## I. BACKGROUND[1]

Dal-Tile, a wholly-owned subsidiary of Mohawk ESV, Inc., manufactures, distributes, and markets ceramic tile and natural stone products. (C. Diksa Aff., DE # 62-11, ¶¶ 1-2.) It operates eight manufacturing facilities, five regional distribution centers, and over 250 sales service centers, including both stone yards and tile showrooms. (Id. ¶ 2.) Dal-Tile's products are sold through its company-owned sales service centers, home retail stores, and independent distributors. (Id.)

In June 2008, Dal-Tile acquired the assets of Marble Point, Inc. ("Marble Point"), a stone yard located in Raleigh, North Carolina, from owner Marco Izzi ("Izzi"). (Id. ¶ 3; M. Izzi Dep.,

---

[1] Throughout this opinion, the court presents the facts, supported by the record, in the light most favorable to plaintiff, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

DE # 78-2, at 11:9-10.)[2] Dal-Tile incorporated this newly-acquired operation into a sale service center organization in Raleigh (the "Stoneyard"). (C. Diksa Aff., DE # 62-11, ¶ 3.) After this sale, Izzi purchased an ownership interest in VoStone, Inc. ("VoStone"), a Raleigh-based kitchen and bath remodeling center. (Pl.'s Dep., DE # 62-1, at 202:17-19; 210:22-211:13; 217:24-218:1; M. Izzi Dep., DE # 78-2, at 8:19-9:6.) James Vose ("Vose") was also a co-owner of VoStone. (J. Vose Dep., DE # 62-9, at 9:5-11.) A significant percentage of VoStone's business involved working with Dal-Tile. (M. Izzi Dep., DE # 78-2, at 9:22-25.)

In August 2006, plaintiff Lori Freeman ("plaintiff") began working as a receptionist for Dal-Tile's predecessor, Marble Point. (Pl.'s Dep., DE # 78-1, at 87:1-88:25.) She was hired on a temporary basis through a staffing agency and, after six months, she joined Marble Point as a permanent employee. (Id.; see also id. at 90:4-14.) Throughout her tenure at Marble Point, plaintiff reported to Izzi and to assistant manager Sara Wrenn ("Wrenn").[3] (Id. at 88:6-12.)

Following Dal-Tile's acquisition of Marble Point, plaintiff became a Dal-Tile employee. (Id., DE # 62-1, at 131:1-132:23.) Wrenn continued to act as plaintiff's supervisor. (S. Wrenn Dep., DE # 78-4, at 10:17-24; 11:14-16.) On 10 June 2008, Dal-Tile's Regional Human Resources Manager visited the Stoneyard and held a group meeting with the employees to review Dal-Tile's policies and employee benefits programs. (Pl.'s Dep., DE # 62-1, at 127:21-23; 132:16-133:3; C. Diksa Aff., DE # 62-11, ¶ 5; S. Wrenn Dep., DE # 78-4, at 11:17-22.) At

---

[2] The parties have filed excerpts from each deposition submitted in this case under multiple docket entries. For example, excerpts from plaintiff's deposition were filed at docket entry numbers 62-1, 78-1, and 79-6. The excerpts from the witnesses' depositions vary in terms of their content and are scattered throughout the electronic record. This has made it impossible for the court to consistently refer to a single docket entry when citing the deposition testimony for each witness. As a result, the court has carefully noted the relevant docket entry for each record citation.

[3] Wrenn now goes by the name Sara Holland. In order to avoid confusion, the court will refer to her as Wrenn throughout this opinion, even when citing to her deposition testimony.

2

that time, plaintiff received Dal-Tile's employee handbook, including its policy prohibiting harassment and discrimination. (Pl.'s Dep., DE # 62-1, at 127:10-23; 131:22-136:13 & Exs. 5-8.) Dal-Tile's policy against harassment, which was in place throughout plaintiff's tenure, states that Dal-Tile will not tolerate harassment based on an individual's sex, race, or other protected characteristics. (Id. at 133:4-20 & Ex. 6; C. Diksa Aff., DE # 62-11, ¶ 6 & Ex. C.) It also defines the sort of conduct prohibited, provides avenues for employees to report harassment to the company, and prohibits retaliation against individuals who raise complaints under the policy. (Id.)

Plaintiff's first position with Dal-Tile was that of General Office Clerk. (Pl.'s Dep., DE # 62-1, at 159:21-25.) Over time, plaintiff began interacting more frequently with Dal-Tile's customers, and she effectively functioned as a Customer Service Representative. (Id., DE # 78-1, at 160:1-8; C. Diksa Aff., DE # 62-11, ¶ 14.) In May 2009, she was promoted to the role of Sales Consultant. (C. Diksa Aff., DE # 62-11, ¶ 13 & Ex. E; Pl.'s Dep., DE # 78-1, at 160:9-22.) In November 2009, plaintiff's position was reclassified to Customer Service Representative. (C. Diksa Aff., DE # 62-11, ¶¶ 19-20 & Exs. F, G.)

Timothy Koester ("Koester") worked as an independent sales representative for VoStone. (M. Izzi Dep., DE # 62-5, at 12:13-23; J. Vose Dep., DE # 62-9, at 9:15-10:6; T. Koester Dep., DE # 78-8, at 17:6-15.) Plaintiff interacted with Koester "almost two or three times a day" while he was conducting business with Dal-Tile on behalf of VoStone. (Pl.'s Dep., DE # 78-1, at 101:11-12.) Plaintiff testified that she was "friendly" with Koester as long as he was not making "lewd comments." (Id., DE # 79-6, at 193:18-19.)

Plaintiff alleges that she heard Koester make offensive remarks during the course of her

employment with Marble Point and Dal-Tile.  About two weeks after plaintiff became a temporary employee with Marble Point in August 2006, she overheard Koester as he walked into Wrenn's office and, referencing a photograph of two former employees, asked Wrenn and another employee: "[W]ho are these two black bitches[?]"  (Pl.'s Dep., DE # 78-1, at 108:12; <u>see also</u> <u>id.</u> at 107-109.)  Wrenn replied: "[T]hey used to work here and I would appreciate you not to use that language here."  (<u>Id.</u> at 108:12-14.)  After the incident, plaintiff asked Wrenn about Koester, inquiring: "[W]ho was he and what was his deal[?]"  (<u>Id.</u> at 109:4-5.)  Wrenn replied: "[H]e's an asshole, but I don't think he'll do it again."  (<u>Id.</u> at 109:5-6.)  The next day, plaintiff told Koester that his remark made her feel very uncomfortable, and she asked him not to use that sort of language.  (<u>Id.</u> at 107:19-21.)  Koester apologized and said it would never happen again. (<u>Id.</u> at 107:22-24.)

Plaintiff also recalled Koester making comments about women he had been with the night before.  (<u>Id.</u> at 116:2-4.)  On one occasion, Koester showed her a photograph of a naked woman on his cell phone and remarked: "[T]his is what I left in my bed to come here today." (<u>Id.</u> at 116:18-19; <u>see also</u> T. Koester Decl., DE # 78-7, ¶ 7.)  On a different occasion, plaintiff overheard Koester talking with one of her co-workers, Jodi Scott ("Scott"), about photographs of Scott's daughters that were displayed in Scott's office.  According to plaintiff, Koester told Scott: "I'm going to hook up with one your daughters," or "I'm going to turn one of your daughters out."  (Pl.'s Dep., DE # 78-1, at 206:17-19.)  Scott replied: "[Y]ou better stay away from my kids," or "[D]on't talk to me about my kids."  (<u>Id.</u> at 206:20-21.)

On 3 June 2009, Koester called plaintiff about covering a customer appointment for him because he had been partying the night before.  (<u>Id.</u> at 125:23-126:18; 136:20-25; <u>id.</u>, DE # 62-1,

at 121:12-23 & Ex. 4 at 00088.) Koester indicated that he could not come into the office, saying: "I'm just too fucked up, don't take offense, but I'm as fucked up as a nigger's checkbook." (Id., DE # 78-1, at 139:13-15; see also id., DE # 62-1, at 121:12-23 & Ex. 4 at 00088.) Plaintiff told Wrenn about Koester's comment that same day (id., DE # 78-1, at 141:13-143:8), but Wrenn just "scoffed and shook her head" (id. at 142:2). Plaintiff also reported Koester's remark to Vose, one of the co-owners of VoStone. (Id. at 145:20-148:1.) Vose laughed and said: "[Y]ou got to admit that's kind of funny, just do what I do and hit him because he's an asshole." (Id. at 147:19-21.)

Subsequently, on 29 July 2009, Koester called Dal-Tile's general office line, and plaintiff answered the phone.[4] (Id., DE # 62-1, at 151:18-24.) Koester had his daughter Angelina with him at the time. (Id., DE # 78-1, at 152:2-22.) Angelina kept interrupting Koester while he was trying to talk with plaintiff about a customer order. (Id.) Plaintiff, who knew Angelina, asked Koester to tell Angelina that she said "hi." (Id. at 152:22-23; see also id., DE # 79-6, at 194:4-195:17.) Instead, Koester put plaintiff on speaker phone so that she and Angelina could talk with one another. (Id., DE # 78-1, at 152:24-153:1.) Plaintiff then heard Angelina ask: "Daddy, who's that[?]" (Id. at 153:1-2.) Koester replied: "[T]hat's the black bitch over at Marble Point." (Id. at 153:2-3; see also id., DE # 62-1, Ex. 4 at 00080.) Plaintiff "immediately became very irate."[5] (Id., DE # 78-1, at 153:4.) She told Koester: "[D]on't you ever call me a black bitch as long as you live." (Id. at 153:8-9.) Koester responded: "[O]h, word." (Id. at

<hr />

[4] None of Dal-Tile's employees had direct-dial phone lines. As a result, all incoming calls came through the general office line. (Pl.'s Dep., DE # 78-1, at 237:21-238:8.)

[5] At her deposition, plaintiff further testified about the ramifications of the 29 July 2009 incident: "I think really at that point was where the whole headaches, the headaches started happening, my shortness of breath, you know, kind of thing and I just was immediately angered . . . ." (Pl.'s Dep., DE # 78-1, at 153:4-8.)

153:10.) Plaintiff promptly told Wrenn about Koester's comment, but Wrenn appeared uninterested and continued a conversation that she had been having with some other co-workers. (Id. at 154:3-24; id., DE # 62-1, Ex 4 at 00080.)

The next day, 30 July 2009, plaintiff called the Stoneyard around 6:45 a.m. and told her co-worker Scott that she was very upset and that she would not report to work that day. (Id., DE # 78-1, at 157:5-158:12; id., DE # 62-1, Ex. 4 at 00080.) Plaintiff then called Dal-Tile's Regional Human Resources Manager, Cathy Diksa ("Diksa"), and left a message on her cell phone. (Id., DE # 78-1, at 166:10-168:8; id., DE # 62-1, Ex. 4 at 00080.) Diksa returned plaintiff's call the same day around 9:00 or 9:30 a.m., and plaintiff told Diksa that Koester had called her a black bitch. (Id., DE # 78-1, at 167:12-15; 168:9-19; id., DE # 62-1, Ex. 4 at 00080.) Diksa asked plaintiff what she would like to have done, and plaintiff said that she could not work with Koester anymore. (Id., DE # 78-1, at 168:20-25; id., DE # 62-1, Ex. 4 at 00081.) Diksa replied: "[O]kay, that's it, he's banned." (Id., DE # 78-1, at 168:25-169:1; id., DE # 62-1, Ex. 4 at 00081.)

After Diksa reminded plaintiff to notify her manager of her absence, plaintiff contacted Wrenn and apologized for not calling her earlier. (Id., DE # 62-1, at 190:1-25 & Ex. 4 at 00081.) Plaintiff explained that she was extremely upset and had needed time to calm down. (Id. at 190:25-191:2 & Ex. 4 at 00081.) Wrenn stated that she did not realize that Koester's comment had upset plaintiff so badly and that plaintiff had not given her enough time to react. (Id., Ex. 4 at 00081; id., DE # 78-1, at 191:3-5.) Plaintiff responded: "[Y]ou had time to react after I told you about the incident. The sun should not have set on this incident without you addressing it." (Id., DE # 78-1, at 191:5-8; see also id., DE # 62-1, Ex. 4 at 00081.) Wrenn then apologized "for

not taking the necessary steps." (Id., DE # 78-1, at 191:11-12.)

After discussing the matter with plaintiff and Diksa, Wrenn told Koester: "'Until this is sorted out, . . . you are not to come back here.'" (S. Wrenn Dep., DE # 78-4, at 31:11-12.) Wrenn also told Vose that Koester was "to not come around until we sort this out." (Id. at 32:12-13.) Wrenn informed plaintiff that she had told Vose and Koester that Koester was "banned from the facility." (Pl.'s Dep., DE # 78-1, at 202:10; see also id., DE # 62-1, Ex. 4 at 00081 (Wrenn assured plaintiff that Koester "was banned").)

On 31 July 2009, plaintiff suffered a panic attack and sought emergency medical care. (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. M, DE # 78-13.) A few days later, on 4 August 2009, Koester called Dal-Tile's office around 8:00 a.m., but plaintiff did not answer the phone. (Pl.'s Dep., DE # 78-1, at 197:19-21.) About half an hour later, plaintiff saw a car pull up outside the building and noticed that it was Koester. (Id. at 197:13-19.) Koester came up to the front door, made eye contact with plaintiff, and picked up some product samples that had been left outside the building for him. (Id. at 231:25-232:12.) Koester then left the premises without entering the building or speaking with plaintiff. (Id. at 197:25-198:6; 232:11-12.)

The next day, 5 August 2009, plaintiff emailed Diksa and Wrenn requesting "clarification" on the parameters of Koester's "ban" and the extent to which she would have to continue to deal with him. (Id. at 198:7-17; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. N, DE # 78-14.) Plaintiff explained that Koester's visit the previous day had sent her into "a state of panic and anxiety." (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. N, DE # 78-14.) Diksa replied to the email the following day. (Pl.'s Dep., DE # 78-1, at 198:18-20; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. O, DE # 78-15.) She stated that she would be traveling to Raleigh the following week and that

7

she would meet with plaintiff to discuss the situation further and to make sure that they were "all on the same page." (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. O, DE # 78-15.)

On 11 August 2009, Diksa met with plaintiff at the Stoneyard to discuss plaintiff's concerns about Koester's behavior. (C. Diksa Dep., DE # 62-2, at 19:3-20:12; C. Diksa Aff., DE # 62-11, ¶ 25; Pl.'s Dep., DE # 78-1, at 202:23-203:19.) Plaintiff again reported Koester's 29 July 2009 "black bitch" comment, and she also told Diksa about the remark that Koester had made about being "as fucked up as a nigger's checkbook" in June 2009. (Pl.'s Dep., DE # 78-1, at 202:23-203:16.) After talking with plaintiff, Diksa called Wrenn into the meeting. (Id. at 203:17-22; C. Diksa Aff., DE # 62-11, ¶ 26.) Diksa told plaintiff that Dal-Tile would not tolerate the sort of behavior that plaintiff had reported. (C. Diksa Dep., DE # 62-2, at 20:5-9; C. Diksa Aff., DE # 62-11, ¶ 26; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00100.) According to plaintiff, Diksa stated that Koester would be suspended for six months. (Pl.'s Dep., DE # 62-1, at 211:14-212:12 & Ex. 4 at 00083.)

That same day, Diksa also met individually with Wrenn and with Dal-Tile employee Patrick Pendry ("Pendry"), whom plaintiff had identified as a witness to the "black bitch" comment that Koester had made to her over the phone. (C. Diksa Dep., DE # 62-2, at 20:13-25; id., DE # 78-5, at 21:1-26:12; C. Diksa Aff., DE # 62-11, ¶ 27; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00101.) Pendry told Diksa that he had heard Koester make the comment while he was standing near plaintiff's desk. (Id.)

After her meetings in Raleigh, Diksa reported the results of her investigation to Dal-Tile's Regional Vice President, Scott Maslowski ("Maslowski"). (S. Maslowski Dep., DE # 62-7, at 13:6-9; C. Diksa Aff., DE # 62-11, ¶ 28; C. Diksa Dep., DE # 78-5, at 26:13-21; Pl.'s Mem.

Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00101.) She told Maslowski about the inappropriate remarks plaintiff had reported and about her conclusion that Koester's behavior should not be tolerated. (C. Diksa Aff., DE # 62-11, ¶ 28; C. Diksa Dep., DE # 78-5, at 26:22-27:2.) Maslowski and Diksa discussed various solutions that would permit Koester to continue doing business with Dal-Tile on behalf of VoStone but minimize or eliminate any contact between him and plaintiff. (C. Diksa Dep., DE # 62-2, at 28:1-12; id., DE #78-5, at 27:7-25; C. Diksa Aff., DE # 62-11, ¶ 28; S. Maslowski Dep., DE # 62-7, at 13:10-14:22; 19:14-20:2.)

On 12 August 2009, Izzi sent an email to Maslowski and Wrenn. (S. Maslowski Dep., DE # 62-7, at 20:3-14; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. P, DE # 78-16.) In the email, Izzi stated: "[Y]ou have communicated to us that Tim [Koester], a Vostone Sales Rep., is no[] longer welcome to visit your premises." (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. P, DE # 78-16, at 00106.) Izzi expressed concern over the matter based on his perception that there was a "personal, friendly relationship" between plaintiff and Koester. (Id. at 00107.) Izzi concluded the email by stating: "[W]e need to know officially what is your final position on this issue." (Id.)

On 17 or 18 August 2009, Maslowski, Izzi, and plaintiff met to discuss a potential course of action that would both protect plaintiff and maintain Dal-Tile's business relationship with VoStone. (M. Izzi Dep., DE # 62-5, at 18:19-19:11; 21:14-23:18; S. Maslowski Dep., DE # 62-7, at 23:9-24:25; id., DE # 78-3, at 25:1-26:2; Pl.'s Dep., DE # 78-1, at 218:8-221:25.) Plaintiff was very upset during the meeting as she explained how she felt when Koester called her a black bitch and "how degrading it was." (Pl.'s Dep., DE # 78-1, at 219:17.) Izzi asked if a "public apology" from Koester would be sufficient, and plaintiff said "absolutely not." (Id. at 219:22-

23.)  Plaintiff was asked to consider a solution that would allow Koester to continue doing business with Dal-Tile, and she indicated that she needed time to respond because she had been previously told by Diksa that a six-month ban was in effect.  (Id. at 221:7-16; id., DE # 62-1, Ex. 4 at 00083-84; S. Maslowski Dep., DE # 78-3, at 25:9-15.)  Plaintiff left the meeting with the understanding that she would be given some time to think about the matter.  (Pl.'s Dep., DE # 78-1, at 221:12-16; 224:8-16; id., DE # 62-1, Ex. 4 at 00084; S. Maslowski Dep., DE # 78-3, at 25:14-15.)  Maslowski testified that at the time of this meeting, he believes that Dal-Tile "would have asked Vostone to just minimize [Koester] coming into the building until we could get to a resolution."  (S. Maslowski Dep., DE # 78-3, at 25:22-24.)  Plaintiff remained very upset after the conclusion of the meeting and cried uncontrollably at her desk.  (Pl.'s Dep., DE # 78-1, at 224:18-19.)

On 19 August 2009, Wrenn sent an email to plaintiff saying: "Come talk to me when you are ready."  (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. Q, DE # 78-17.)  When plaintiff talked with Wrenn, she stated that no one was allowing her time to heal and that she could not mentally or physically bring herself to try to continue working with Koester.  (Id.; Pl.'s Dep., DE # 78-1, at 231:8-15.)  Plaintiff explained that "being forced to still have to work around" Koester was affecting her health:

> And I was telling her that it was making me sick, that I'm going to have to go to the doctors, that I can't think straight, it's affecting my work, I can't focus, that I'm coming in almost every day not knowing what to expect, I'm being told one thing and then the next day I'm being told another.

(Pl.'s Dep., DE # 78-1, at 231:11-12, 16-21.)

At some point in mid to late August 2009, Koester called Dal-Tile's general office number, and plaintiff answered the phone.  (Id. at 232:19-234:25; id., DE # 62-1, at

10

236:1-237:5.) Koester was attempting to complete a sale to Elaine Wiggins ("Wiggins"), a customer whom plaintiff had referred to him. (Id.; T. Koester Dep., DE # 62-6, at 56:5-8.) Koester asked whether Wiggins had selected her product, and plaintiff replied that she had not. (Pl.'s Dep., DE # 62-1, at 236:9-14; 237:1-5.) That was the full extent of the conversation, which lasted two minutes or less. (Id. at 236:13-25.) Plaintiff did not report the phone call to anyone at Dal-Tile. (Id., DE # 78-1, at 234:24-25.) Koester later sent an email to plaintiff on 28 August 2009, stating: "Hey don't worry about Elaine Wiggins tomorrow! She just called and canceled on me. I'll keep you guys posted on what she wants to do!" (Id. at 234:1-23; 237:6-8; T. Koester Dep., DE # 62-6, at 23:16-24:4 & Ex. 11; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. S, DE # 78-19.)

On 31 August 2009, Diksa sent a letter to Izzi regarding Koester. (C. Diksa Dep., DE # 62-2, at 34:1-9; 35:3-6 & Ex. 5; C. Diksa Aff., DE # 62-11, ¶ 32 & Ex. J; M. Izzi Dep., DE # 62-5, at 27:10-20; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. T, DE # 78-20.) Maslowski was copied on the letter. (C. Diksa Dep., DE # 62-2, Ex. 5; C. Diksa Aff., DE # 62-11, Ex. J; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. T, DE # 78-20.) In relevant part, it stated:

> This will confirm our phone conversation, as we discussed we have set parameters for your Sales Representative when he does business at our Stone Location in Raleigh.
> . . . .
>
> The behavior that was exhibited by your employee was unacceptable and will not be tolerated. As was decided beginning August 4, and through the next 6 months, your employee is not to have any contact with our employee, including over the phone. If he needs to show a customer product he is to do so by working with our manager, Sara Wrenn. She will then accompany him and his customers into the facility.

(Id.) Koester also testified that he "was told [he] was not allowed to go near [plaintiff]

anymore." (T. Koester Dep., DE # 62-6, at 53:23-24.)

On the same day, 31 August 2009, Koester contacted Wrenn to coordinate a time for him to accompany Wiggins to the Stoneyard so that Wiggins could select her product. (Pl.'s Dep., DE # 78-1, at 246:9-16; S. Wrenn Dep., DE # 78-4, at 52:17-53:2.) After conferring with Diksa, Wrenn decided to arrange Koester's visit while plaintiff was at lunch so the two would not encounter one another. (S. Wrenn Dep., DE # 78-4, at 52:17-53:2.) Accordingly, Wrenn contacted plaintiff and asked when she would be going to lunch, and plaintiff said she would go around noon. (Id., Pl.'s Dep., DE # 78-1, at 237:11-17.) Because plaintiff had noticed that Koester had called the general office line earlier that morning,[6] she later called Wrenn back and asked whether Koester would be visiting the facility that day. (Id. at 237:15-16; 239:19-22; 246:9-16.) Wrenn said that Koester needed to visit the Stoneyard with Wiggins and explained that she was trying to coordinate the visit while plaintiff was not there. (Id. at 239:23-240:3.) Plaintiff protested that she thought Koester was "suspended, period" and claimed that she was not told that Koester could visit the Stoneyard in her absence. (Id. at 240:6.) She then stated that she would not leave the building for lunch after all. (Id. at 240:7-9.) Wrenn replied that she had already told Koester he could come. (Id. at 240:9-10.)

Koester visited the Stoneyard with Wiggins as planned. Plaintiff was in the front office when she saw Koester and Wiggins outside the building. (Id. at 240:11-20.) Wiggins started to enter the front office, but Koester said, "no, let's go around this way," and they walked around the building and entered the warehouse area in the back. (Id., DE # 62-1, at 249:2-3; see also id. at 247:11-249:17.) Plaintiff went to the break room and cried because she could not believe that

---

[6] Plaintiff did not speak to Koester when he called the office on 31 August 2009. (Pl.'s Dep., DE # 78-1, at 237:18-20.)

Koester was back.  (Id., DE # 78-1, at 240:21-23.)  She then left the building and "just kind of drove around" until she confirmed with a co-worker that Koester was no longer there.  (Id. at 241:16.)  Plaintiff did not talk with Koester or Wiggins during their 31 August 2009 visit.  (Id., DE # 62-1, at 249:18-250:5.)

The next day, 1 September 2009, plaintiff sent an email to Wrenn stating: "I just wanted to say that I am not happy with [Koester] coming here whether I am at lunch or not. . . .  I just hope that this is not something that will continue, that as long as I am not here then he is allowed to be here because that is not what I was told could happen."  (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. U, DE # 78-21; see also Pl.'s Dep., DE # 78-1, at 243:12-244:5.)  Plaintiff also called Dal-Tile's employee relations hotline to report her displeasure with Koester's visit.  (Pl.'s Dep., DE # 78-1, at 242:1-5.)  Her hotline call was referred to Diksa, who contacted plaintiff.  (Id. at 242:5-243:4.)  Diksa informed plaintiff that Dal-Tile had sent a letter to Izzi because it had been determined that Koester would still be permitted to do business with Dal-Tile.  (Id. at 242:10-18; id., DE # 62-1, Ex. 4 at 00087; C. Diksa Aff., DE # 62-11, ¶ 35; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00101.)  Diksa stated that all of Koester's phone calls would be directed to Wrenn's cell phone and that he was to have no contact with plaintiff.  (Pl.'s Dep., DE # 62-1, Ex. 4 at 00087; id., DE # 78-1, at 242:10-18; C. Diksa Dep., DE # 62-2, at 30:16-31:12; C. Diksa Aff., DE # 62-11, ¶ 35.)

Plaintiff was so upset about the prospect of Koester being permitted to visit the Stoneyard that she took a medical leave of absence beginning 2 September 2009.  (Pl.'s Dep., DE # 78-1, at 253:2-4; 254:6-23.)  She told Diksa that she "was sick from having to deal with the fact that [Koester] was allowed to come back."  (Id. at 258:18-19.)  Plaintiff subsequently received

treatment for depression and anxiety. (See, e.g., Pl.'s Mem. Opp'n Mot. Summ. J., Exs. V-AA, DE ## 78-22 through 78-27.) Both parties agree that plaintiff applied for and received short-term disability benefits from Aetna, Dal-Tile's third-party insurance carrier, for several weeks.[7] (See Def.'s Mem. Supp. Mot. Summ. J., DE # 61, at 10; Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 14.)

Plaintiff returned to work on or about 19 November 2009. (C. Diksa Aff., DE # 62-11, ¶ 42; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00102; id., Ex. FF, DE # 78-32.) She met with Wrenn, who informed her that Koester no longer worked for VoStone but worked for another kitchen and bath fabricator, Gresham Riggs. (Pl.'s Dep., DE # 78-1, at 273:9-14; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. FF, DE # 78-32.) Plaintiff asked Wrenn if Koester was still coming to Dal-Tile, and she said "not as much but he still comes." (Pl.'s Dep., DE # 78-1, at 273:24.) Wrenn also told plaintiff that Koester would continue to call Wrenn's cell phone and not the general office line if he needed to conduct business with Dal-Tile. (Id. at 273:15-17; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. FF, DE # 78-32.) Although plaintiff did not encounter Koester following her return from medical leave, one of her co-workers told her that Koester visited Dal-Tile in the latter part of November or early December but that he did not stay long. (Pl.'s Dep., DE # 62-1, at 273:25-274:18.)

On 7 December 2009, plaintiff notified Dal-Tile that she was resigning from her position effective 11 December 2009. (Id., DE # 78-1, at 281:14-22; C. Diksa Aff., DE # 62-11, ¶ 44 & Ex. M.) Her resignation letter did not contain an explanation for her decision, but plaintiff

---

[7] This information is purportedly found at pages 257 through 263 and at page 268 of plaintiff's deposition, but only pages 257 and 258 have been submitted by the parties. These pages show only that plaintiff talked with someone at Dal-Tile about applying for short-term disability benefits. (See Pl.'s Dep., DE ## 62-1, 78-1, 79-6.)

testified that she resigned because the depression and anxiety became too much for her.  (Pl.'s

Dep., DE # 78-1, at 281:23-282:1.)  According to plaintiff, she "just always had this sense [that]

even though [Koester] was fired from VoStone, regardless of where he worked, he still had the

ability to come [to the Stoneyard]."  (Id. at 282:1-3; see also id. at 273:14-15.)

     While she was out on medical leave, plaintiff filed a charge of employment

discrimination with the Equal Employment Opportunity Commission ("EEOC") on 28 October

2009.  (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. BB, DE # 78-28.)  In her EEOC charge, plaintiff

asserted that Dal-Tile had subjected her to discrimination based on her sex and race.  (Id.)  The

EEOC issued a Notice of Right to Sue showing the "Date Mailed" as 28 July 2010.  (C. Diksa

Aff., DE # 62-11, Ex. L; Pl.'s Decl., DE # 78-36, Ex. 1.)  Plaintiff maintains that she did not

receive the Notice of Right to Sue until 25 August 2010.  (Pl.'s Decl., DE # 78-36, ¶ 8.)

     Plaintiff commenced this lawsuit on 20 November 2010, and she filed an amended

complaint on 4 April 2012.  (DE ## 1, 55.)  In this action, plaintiff asserts a racial hostile work

environment claim under 42 U.S.C. § 1981; racial and sexual hostile work environment claims

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII");

retaliatory demotion and discharge claims under 42 U.S.C. § 1981; a discriminatory discharge

claim under 42 U.S.C. § 1981; and an obstruction of justice claim under North Carolina common

law.

     On 30 May 2012, Dal-Tile filed a motion for summary judgment.  (DE # 60.)  Plaintiff

responded to the motion on 9 November 2012.  (DE # 78.)  Dal-Tile filed a reply on 30

November 2012.  (DE # 79.)

## II. DISCUSSION

A.  Summary Judgment Standard

Summary judgment is proper only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should be granted only in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party and to view the facts in the light most favorable to the non-moving party. Id. at 255. The moving party has the burden to show an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. Id. at 252. Furthermore, evidence that is "merely colorable" or "not significantly probative" will not suffice to defeat a motion for summary judgment. Id. at 249. Rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then disposition by summary judgment is appropriate. Id. at 250; see also Teamsters Joint Council No. 83 v. Centra, Inc., 947

F.2d 115, 119 (4th Cir. 1991).

B.    Timeliness of Plaintiff's Complaint

As an initial matter, Dal-Tile contends that plaintiff's Title VII claims should be dismissed because they are untimely.  Title VII plaintiffs have a ninety-day period in which to file their claims after the EEOC has given them a Notice of Right to Sue ("Notice").  See 42 U.S.C. § 2000e-5(f)(1); Watts-Means v. Prince George's Family Crisis Ctr., 7 F.3d 40, 42 (4th Cir. 1993).  In this case, the Notice shows the "Date Mailed" as 28 July 2010.  (C. Diksa Aff., DE # 62-11, Ex. L; Pl.'s Decl., DE # 78-36, Ex. 1.)  Dal-Tile argues that plaintiff is presumed to have received the Notice within three days of mailing.  See, e.g., Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 148 & n.1 (1984).  Applying the three-day presumption, Dal-Tile maintains that plaintiff should have filed her lawsuit by 1 November 2010.  However, plaintiff did not commence this action until 20 November 2010.  (DE # 1.)

In response, plaintiff argues that the three-day mailing presumption is rebuttable and that her evidence raises a genuine dispute of material fact as to whether her lawsuit was timely filed. The court agrees with plaintiff.  Although the Notice shows the "Date Mailed" as 28 July 2010, plaintiff has submitted a copy of the EEOC's case log, which does not reflect actual mailing on that date.  (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. KK, DE # 78-37.)  Furthermore, plaintiff has come forth with evidence demonstrating that she did not receive the Notice until 25 August 2010.[8]  (See Pl.'s Decl., DE # 78-36; Pl.'s Mem. Opp'n Mot. Summ. J., Exs. LL-MM, DE ## 78-38, 78-39.)  If plaintiff received the Notice on 25 August 2010, then her complaint was timely

---

[8] The court also points out that although Dal-Tile states that it received the EEOC Notice shortly after 28 July 2010, this statement is not supported by a witness with personal knowledge of the matter.  (See C. Diksa Aff., DE # 62-11, ¶ 39.)

filed within the statutory period. Thus, a genuine dispute of material fact exists with respect to this issue, and Dal-Tile cannot obtain summary judgment on plaintiff's Title VII claims based on the ninety-day statutory limitations period.[9]

C.    Hostile Work Environment Claims

Plaintiff asserts that she was exposed to a hostile work environment because of her sex and her race.[10]  To demonstrate a hostile work environment claim, a plaintiff must show that the alleged conduct was (1) unwelcome, (2) based on her sex or race, (3) sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment, and (4) imputable to her employer.[11]  Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001).  An actionable hostile work environment claim requires that "the harassing 'conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment.'"  EEOC v. Sunbelt Rentals, Inc., 521 F.3d

---

[9] Dal-Tile cites to a decision by this court, Severino-Todd v. Wal-Mart, Inc., No. 5-11-CV-336-BR, 2011 WL 6370483 (E.D.N.C. Dec. 20, 2011), aff'd, 470 F. App'x 139 (4th Cir. 2012) (unpublished), in support of its argument that plaintiff's Title VII claims are untimely.  However, in Severino-Todd, the plaintiff did not deny that she filed her lawsuit after the expiration of the ninety-day statutory deadline.  Id. at *2.

[10] Here, plaintiff has brought racial hostile work environment claims both under 42 U.S.C. § 1981 and under Title VII.  (See Am. Compl., DE # 55, at 9-10 ¶¶ 59-69.)  The court notes that the standards applied to evaluate a hostile work environment claim under 42 U.S.C. § 1981 are the same standards used to evaluate such a claim under Title VII.  See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001); Murry v. Jacobs Tech., Inc., No. 1:10-cv-771, 2012 WL 1145938, at *13 (M.D.N.C. Apr. 5, 2012); Alexander v. City of Greensboro, 762 F. Supp. 2d 764, 792 (M.D.N.C. 2011).

[11] Contrary to Dal-Tile's argument with respect to plaintiff's sex-based hostile work environment claim (see Def.'s Mem. Supp. Mot. Summ. J., DE # 61, at 14-15), the court may consider incidents occurring outside of the 180-day period preceding plaintiff's EEOC charge because the very nature of the claim is one of conduct that was allegedly repeated and pervasive.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."); Jones v. City of Lakeland, 318 F. App'x 730, 735 n.10 (11th Cir. 2008) (per curiam) (unpublished).

18

306, 315 (4th Cir. 2008) (alterations in original) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher, 524 U.S. at 788 (citation and internal quotation marks omitted).  Moreover, "Title VII does not attempt to 'purge the workplace of vulgarity.'"  Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).  Rather, plaintiff "must show that the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere."  EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (quoting Jennings v. U.N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc)).  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  Faragher, 524 U.S. at 788 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).

  1.  Harassment that is severe or pervasive

   Dal-Tile contends that plaintiff cannot establish the third element of a *prima facie* case. The third element of a hostile work environment claim focuses on whether plaintiff was subjected to harassment that was sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment.  A plaintiff "must clear a high bar" in order to prove this element.  Sunbelt Rentals, 521 F.3d at 315.  "In order to clear the high threshold of actionable harm, the conduct in question must (1) be 'severe or pervasive enough to create an objectively hostile or abusive work environment' and (2) be subjectively perceived by the victim to be abusive."  EEOC v. R & R Ventures, 244 F.3d 334, 339 (4th Cir. 2001) (quoting Harris v.

Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Faragher, 524 U.S. at 787 (A hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."); Sunbelt Rentals, 521 F.3d at 315. The objective prong of this inquiry "is designed to disfavor claims based on an individual plaintiff's hyper-sensitivity." EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 328 (4th Cir. 2010).

There is no "mathematically precise test" for determining if an environment is objectively hostile or abusive. Harris, 510 U.S. at 22. Instead, the "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Oncale, 523 U.S. at 81 (quoting Harris, 510 U.S. at 23). These circumstances include (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with the plaintiff's work performance; and (5) what psychological harm, if any, resulted from the harassment. See Faragher, 524 U.S. at 787-88; Harris, 510 U.S. at 23; Fairbrook Med. Clinic, 609 F.3d at 328; Sunbelt Rentals, 521 F.3d at 315. This inquiry also "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." Oncale, 523 U.S. at 81. "Conduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another." Fairbrook Med. Clinic, 609 F.3d at 328.

In this case, the court has no doubt that plaintiff subjectively perceived the alleged racial and sexual harassment to be abusive. The evidence also demonstrates that the harassment unreasonably interfered with plaintiff's work and that plaintiff experienced psychological harm

20

as a result.[12]  However, as explained below, the evidence presented would not permit a reasonable jury to find from an objective viewpoint that plaintiff's environment was hostile because the alleged harassment was not frequent, severe, or physically threatening or humiliating.

        a.  <u>Objective evidence of racial harassment</u>

Plaintiff's racial hostile work environment claims are based in part on three specific incidents.  First, in August or September 2006, plaintiff overheard Koester as he walked into Wrenn's office and, referencing a photograph of two former employees, asked: "[W]ho are these two black bitches[?]"[13]  (Pl.'s Dep., DE # 78-1, at 108:12; <u>see</u> <u>also</u> <u>id.</u> at 107-109.)  A significant time later, on 3 June 2009, Koester called plaintiff about covering a customer appointment for him because he had been partying the night before.  (<u>Id.</u> at 125:23-126:18; 136:20-25; <u>id.</u>, DE # 62-1, at 121:12-23 & Ex. 4 at 00088.)  Koester indicated that he could not come into the office, saying: "I'm just too fucked up, don't take offense, but I'm as fucked up as a nigger's

---

[12] Although the court does not find it necessary to detail all of plaintiff's evidence with regard to these issues, the court highlights that plaintiff cried at work on several occasions as a result of her experiences with Koester.  (<u>See</u>, <u>e.g.</u>, Pl.'s Dep., DE # 78-1, at 154:13-14; 220:21-24; 224:18-24; 240:21-241:20; 243:2.)  In addition, she experienced physical symptoms, such as headaches and shortness of breath, as a result of the harassment.  (<u>Id.</u> at 153:4-8; 254:12-15.)  Plaintiff was so upset about the prospect of Koester being permitted to visit the Stoneyard that she took a medical leave of absence beginning 2 September 2009.  (<u>Id.</u> at 253:2-4; 254:6-23.)  She subsequently received treatment for depression and anxiety.  (<u>See</u>, <u>e.g.</u>, Pl.'s Mem. Opp'n Mot. Summ. J., Exs. V-AA, DE ## 78-22 through 78-27.)  Both parties also agree that plaintiff applied for and received short-term disability benefits from Aetna, Dal-Tile's third-party insurance carrier, for several weeks.  (<u>See</u> Def.'s Mem. Supp. Mot. Summ. J., DE # 61, at 10; Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 14.)

[13] In her deposition, plaintiff testified that this exchange in Wrenn's office occurred in August or September 2006, within a couple of weeks after she began working for Marble Point as a temporary employee.  (Pl.'s Dep., DE # 78-1, at 108:10-109:23.)  She further testified that the documentation she had prepared prior to her deposition inaccurately stated that this incident took place in September 2007.  (<u>Id.</u>, DE # 62-1, at 121:12-124:12 & Ex. 4 at 00091.)  In her amended complaint, however, plaintiff changed her factual assertions to state that this incident occurred in September 2007.  (<u>See</u> Am. Compl., DE # 55, ¶¶ 12-13.)  The court finds that the unverified amended complaint does not create an issue of fact for the purposes of the motion for summary judgment, particularly given plaintiff's unambiguous deposition testimony that the incident occurred in August or September 2006 and that her documentation to the contrary is incorrect.

checkbook." (Id., DE # 78-1, at 139:13-15; see also id. at 126:13-18; id., DE # 62-1, at 121:12-23 & Ex. 4 at 00088.) Finally, on 29 July 2009, while Koester was on the phone with plaintiff, his daughter asked: "Daddy, who's that[?]" (Id., DE # 78-1, at 153:1-2.) Koester replied: "[T]hat's the black bitch over at Marble Point." (Id. at 153:2-3; see also id., DE # 62-1, Ex. 4 at 00080.)

In addition to these three incidents, plaintiff alleges that she was also subject to other racially offensive conduct on a "regular, frequent" basis. (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 21.) Plaintiff has pointed to very little specific evidence in the record to support this contention. A review of all of the excerpts of her deposition testimony reveals no additional examples of racial comments made by Koester.[14] (See Pl.'s Dep., DE ## 62-1, 78-1, 79-6.) Plaintiff attempts to bolster her allegations by claiming that her manager, co-workers, and even Koester himself have provided testimony regarding the severity and frequency of Koester's inappropriate racial comments. (See Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 1, 19-22.) However, plaintiff's co-worker Patrick Suggs testified that he never heard Koester make any racial remarks. (P. Suggs Dep., DE # 79-3, at 9:5-7; 16:18-21.) Wrenn, plaintiff's manager, "assume[d]" (S. Wrenn Dep., DE # 78-4, at 21:6) that Koester made racial jokes, but when

---

[14] In her memorandum in opposition to the motion for summary judgment, plaintiff states that she "used the word 'lewd' to refer to racially and sexually offensive comments during her deposition." (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 7 n.6.) However, the word "lewd" is defined as "sexually unchaste or licentious," "suggestive of or tending to moral looseness," and "inciting to sensual desire or imagination." Webster's Third New Int'l Dictionary (Unabridged) 1301 (1993). Thus, the word "lewd" is commonly understood as having a sexual connotation, and plaintiff did not explain anywhere in her deposition that she understood the word "lewd" to encompass racial remarks. (See Pl.'s Dep., DE ## 62-1, 78-1, 79-6.) As a result, the court considers plaintiff's deposition testimony regarding Koester's lewd comments in relation to her sex-based hostile work environment claim but not in relation to her racial hostile work environment claims.

pressed, she could not provide any specific examples.[15]  (Id. at 20:17-21:3.)

When asked if Koester made racial jokes in the office, plaintiff's co-worker Scott answered "[y]es."  (J. Scott Dep., DE # 78-6, at 13:25.)  When she was asked to elaborate further on what she had heard, she testified that Koester used racial "slang" or "thug talk" such as "Yo, yo," "Yo, bitch," "How's my bitches?" and "What's up?"  (Id., DE # 79-2, at 14:6-20; 30:4-18.) The court does not believe that these phrases are racial on their face.  See Widermyre v. Transamerica Commercial Fin. Corp., No. 95 C 1329, 1995 WL 688709, at *3 (N.D. Ill. Nov. 17, 1995) (finding that "yo" and other "hip-hop" phrases were not facially racist (internal quotation marks omitted)).  It appears that Koester also used these phrases when addressing white employees of Dal-Tile, including Wrenn (see J. Scott Dep., DE # 79-2, at 14:8-19; 18:13-21), and plaintiff does not contend otherwise.  Thus, these allegedly offensive comments are not related to plaintiff's race.  See Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772 (4th Cir. 1997) ("[O]nly harassment that occurs because of the victim's [race] is actionable."); Murry v. Jacobs Tech., Inc., No. 1:10-cv-771, 2012 WL 1145938, at *15 (M.D.N.C. Apr. 5, 2012) (same).  "An insulting or demeaning remark does not create a federal cause of action . . . merely because the 'victim' of the remark happens to belong to a class protected by Title VII."  Hartsell, 123 F.3d at 772.

The court also considers the testimony of Koester himself.  In his declaration, Koester broadly states that he made "racial comments and/or racial jokes" during his visits to Dal-Tile. (T. Koester Decl., DE # 78-7, ¶ 5; see also id. ¶ 4.)  When Koester was asked to describe these

---

[15] The court also notes Diksa's testimony that, according to Wrenn, Koester used "racial language" in the office. (C. Diksa Dep., DE # 78-5, at 24:13-15.)  This testimony is too conclusory to provide support for plaintiff's claim.  See discussion, infra, at 31.

comments and jokes during his deposition, he was able to provide very few details. He recalled one instance where he told plaintiff that Vose, co-owner of VoStone, had said that he (Vose) would never let his wife handle their checkbook because she is black. (T. Koester Dep., DE # 78-8, at 29:11-20; 50:1-13.) Koester also generally testified that he used African-American "slang" when he was in Dal-Tile's office. (Id., DE # 79-4, at 25:18-20.) Furthermore, when President Obama was elected, Koester remarked to plaintiff: "You guys won." (Id. at 25:24-26:4; see also T. Koester Decl., DE # 78-7, ¶ 6.) Finally, he testified that he "probably" made comments about taking "beautiful black girls" home with him. (T. Koester Dep., DE # 78-8, at 50:19.)[16]

After considering all of the evidence, the court concludes that the racially harassing incidents alleged by plaintiff are not, individually or collectively, objectively severe or pervasive enough to alter the conditions of her employment and create a hostile work environment. In August or September 2006, plaintiff overheard Koester ask in reference to a photograph in Wrenn's office: "[W]ho are these two black bitches[?]" (Pl.'s Dep., DE # 78-1, at 108:12; see also id. at 107-109.) This question was not directed at plaintiff, which lessens its impact.[17] See

---

[16] The court disagrees with plaintiff's assertion that "Koester often focused on black women, in particular." (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 3; see also id. at 22 ("Koester frequently made comments about black woman in particular . . . .").) The only support that plaintiff provides for this contention is the above-referenced testimony that Koester "probably" made comments about taking "beautiful black girls" home with him. (T. Koester Dep., DE # 78-8, at 50:19.) As the context makes clear, Koester merely postulated that he might have made such comments, and plaintiff's sought-for inference regarding the frequency of such comments could rest on nothing more than speculation. Moreover, contrary to plaintiff's contention that Koester volunteered additional information regarding the fact that he has had sexual relations with African-American women (see Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 4), it is again clear from the context of the testimony that Koester made the remark that he did because he was responding to a question about whether he had "dated black girls." (T. Koester Dep., DE # 78-8, at 50:21-51:2.)

[17] In discussing these incidents separately, the court remains mindful of its duty to "evaluate the sum total of abuse over time" rather than "consider each incident of harassment in isolation." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999). The purpose of the piecemeal discussion is not to explain away each incident one

(continued...)

Yancick v. Hanna Steel Corp., 653 F.3d 532, 545 (7th Cir. 2011) ("[T]he more remote or indirect the act claimed to create a hostile working environment, the more attenuated the inference that it had an effect on the terms and conditions of the plaintiff's workplace."); Ladd v. Grand Trunk Western R.R., Inc., 552 F.3d 495, 501 (6th Cir. 2009) ("That other slurs . . . were not directed at [plaintiff] diminishes their severity."); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff."); Lester v. Natsios, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) ("Conduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment.").

Similarly, although the court recognizes that the word "nigger" "can have a highly disturbing impact on the listener," Hrobrowski v. Worthington Steel Co., 358 F.3d 473, 477 (7th Cir. 2004), the fact that Koester used the phrase "I'm as fucked up as a nigger's checkbook" to refer to his own condition diminishes its severity.  (Pl.'s Dep., DE # 78-1, at 139:14-15.) Furthermore, Koester used this epithet only once over the course of plaintiff's three-year employment with Dal-Tile.  See Roberts v. Fairfax Cnty. Public Schs., 858 F. Supp. 2d 605, 610-11 (E.D. Va. 2012) (two isolated uses of the word "nigger" were insufficient to permeate the plaintiff's work environment with discriminatory intimidation, ridicule, and insult); Hampton v. J.W. Squire Co., Inc., No. 4:10CV00013, 2010 WL 3927740, at *3-4 (W.D. Va. Oct. 5, 2010) (finding no hostile work environment where supervisor referred to the plaintiff using the word "nigger" three times in the course of one conversation), aff'd, No. 10-2203, 2011 WL 143661

[17](...continued)
by one but to emphasize that the individual occurrences were not "extremely serious."  Faragher, 524 U.S. at 788.

25

(4th Cir. Jan. 18, 2011) (per curiam) (unpublished); <u>Brown v. Dir. SCDC</u>, Civ. A. No. 8:08-3761-HFF-BHH, 2010 WL 3167331, at *5 (D.S.C. Aug. 5, 2010) ("[T]he Fourth Circuit separates general use of epithets from the single use of a slur."); <u>Dotson v. Gulf</u>, No. Civ. A. H-05-0106, 2006 WL 44071, at *13 (S.D. Tex. Jan. 9, 2006) (finding no hostile work environment where a supervisor referred to the plaintiff as a "nigger" once in 1998 and again in 2001).

In addition, Koester's use of derogatory language in referring to plaintiff as a "black bitch" on 29 July 2009 was plainly inappropriate. (Pl.'s Dep., DE # 78-1, at 153:2.) However, as a matter of law, "'[m]ere utterance of an . . . epithet which engenders offensive feelings in a[n] employee' does not sufficiently affect the conditions of employment to implicate Title VII." <u>Lacy v. Amtrak</u>, 205 F.3d 1333 (Table), No. 98-1914, 2000 WL 223335, at *3 (4th Cir. Feb. 28, 2000) (second and third alterations in original) (per curiam) (unpublished) (quoting <u>Harris</u>, 510 U.S. at 21).

Here, plaintiff's claims "depict isolated instances rather than an ongoing situation." <u>Clark v. UPS</u>, 400 F.3d 341, 352 (6th Cir. 2005); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, . . . meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (citation, internal quotation marks, and alteration in original omitted)); <u>Walker v. Miss. Delta Com'n on Mental Health Illness & Mental Retardation</u>, Civ. A. No. 4:11CV044-SA-JMV, 2012 WL 5304755, at *6-7 (N.D. Miss. Oct. 25, 2012) (court refused to consider generic assertions of "continuous" harassment and found that plaintiff could not demonstrate either severe or pervasive conduct where there were only "a handful of specific allegations," including a threat to

"throw [plaintiff's] black ass to the ground" and the characterization of plaintiff as a "black ass, crazy ass, fucking bitch" and as "that black ass, crazy ass woman" (internal quotation marks omitted)); Augustin v. Yale Club of N.Y.C., No. 03-CV-1924 (KMK), 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (noting that calling a person "'black bitch'" and a "'fucking negrita'" is deplorable, but when done only four or five times over a five-year period, it does not create a hostile work environment), aff'd, 274 F. App'x 76 (2d Cir. 2008) (unpublished); Bolden v. N.Y. Hous. Auth., No. 96 CIV 2835(AGS), 1997 WL 666236, at *2 (S.D.N.Y. Oct. 27, 1997) (supervisor's derogatory comments about "'niggers'" made five times over a period of six weeks were insufficient as a matter of law to establish hostile environment claim). The additional incidents described by Koester in his deposition, which are even less substantial than the specific allegations made by plaintiff, are "not enough to elevate the isolated incidents to an ongoing and pervasive hostile environment." Clark, 400 F.3d at 352. Considering the totality of the circumstances, no reasonable fact-finder could say that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21 (citation and internal quotation marks omitted).

In sum, the evidence offered by plaintiff stands in stark contrast to the evidence presented in cases where racial hostile work environment claims have survived summary judgment. See, e.g., Cent. Wholesalers, 573 F.3d at 176-77 (concluding that a reasonable jury could find that the race-based harassment was objectively severe or pervasive where three of plaintiff's co-workers used the word "n* * * *r," and at least one of them used the word "'pretty much every day'"; another co-worker called plaintiff "a black stupid n* * * *r" among other derogatory terms; and two other co-workers kept blue-colored mop-head dolls in their offices and had the dolls hanging

from nooses which were tied around the dolls' necks); Spriggs, 242 F.3d at 182, 184-85 (same where plaintiff was exposed on a "continuous[,] daily" basis to supervisor's "incessant" use of repugnant terms including "nigger," "monkey," and "black bitch," which caused plaintiff to complain "several times" to his supervisors (internal quotation marks omitted)).

        b. Objective evidence of sexual harassment

Plaintiff bases her sexual hostile work environment claim in part on four specific incidents. As detailed above with respect to plaintiff's racial harassment claims, in August or September 2006, plaintiff overheard Koester as he walked into Wrenn's office and, referencing a photograph of two former employees, asked: "[W]ho are these two black bitches[?]" (Pl.'s Dep., DE # 78-1, at 108:12; see also id. at 107-109.) Subsequently, on 29 July 2009, while Koester was on the phone with plaintiff, his daughter asked: "Daddy, who's that[?]" (Id. at 153:1-2.) Koester replied: "[T]hat's the black bitch over at Marble Point." (Id. at 153:2-3; see also id., DE # 62-1, Ex. 4 at 00080.) In addition to these incidents, on an unspecified date, Koester showed plaintiff a photograph of a naked woman on his cell phone and said: "[T]his is what I left in my bed to come here today." (Id., DE # 78-1, at 116:18-19; see also T. Koester Decl., DE # 78-7, ¶ 7.) On another unspecified date, plaintiff overheard Koester talking with Scott about photographs of Scott's daughters that were displayed in Scott's office. According to plaintiff, Koester told Scott: "I'm going to hook up with one your daughters," or "I'm going to turn one of your daughters out." (Pl.'s Dep., DE # 78-1, at 206:17-19.)

Plaintiff further alleges that she was subjected to other sexually offensive conduct on a "regular, frequent" basis. (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 21.) She has testified to the following:

28

• Koester "was always coming in making some sort of lewd comments." (Pl.'s Dep., DE # 78-1, at 110:19-20.)

• "[M]aybe two or three times a week I would have to say something to the effect of Tim, stop or don't say that or I'm on the phone, people can hear you." (Id. at 115:4-7.)

• Koester "would come in to discuss what he did the night before with whatever woman he was with and I would tell him I don't want to hear it." (Id. at 116:2-4.)

• "I was friendly with Tim as long as he wasn't making those lewd comments." (Id., DE # 79-6, at 193:18-19.)

• "Koester always -- he made lewd comments. I heard him referring -- I removed myself out of the situation, but I have heard Tim refer to the Dal-Tile women employees as his bitches." (Id., DE # 78-1, at 205:2-5.)[18]

As with her racial harassment claims, plaintiff also offers the testimony of her co-workers, manager, and Koester himself. The testimony of the witnesses essentially boils down to observations that Koester engaged in the following behavior during his visits to Dal-Tile: he used phrases such as "Yo, bitch" and "How's my bitches?"; he referred to Dal-Tile customers and to women in general as being "good looking," "hot," or as "hot bitches"; he showed pictures of naked women that he had on his phone; and he made comments about what he did when he went out at night or on weekends, some of which contained "sexual content." (See, e.g., S. Wrenn Dep., DE # 78-4, at 14:18-16:5; 18:21-19:9; J. Scott Dep., DE # 78-6, at 10:15-11:2; 12:21-13:17; id., DE # 79-2, at 14:15-19; 30:16; T. Koester Dep., DE # 78-8, at 46:20-25; 50:18-20; P. Suggs Dep., DE # 78-18, at 8:12-14.)

The conduct in the present case is not severe enough to clear the "high bar" which is intended to prevent Title VII from becoming a general civility code. Sunbelt Rentals, 521 F.3d

---

[18] The court has reviewed all of the excerpts of plaintiff's deposition testimony, and these are the only additional statements that were found therein that could support plaintiff's sex-based hostile work environment claim.

at 315.  Koester's use of the phrase "black bitch" on two occasions is offensive, and his general use of the word "bitches" is inappropriate, but such language is not particularly severe.  See, e.g., Russell v. Bd. of Trs. of Univ. of Ill., 243 F.3d 336, 343 (7th Cir. 2001) (concluding that supervisor's habit of referring to plaintiff as "grandma," his comments that all intelligent women are unattractive, calling female employees "bitches," and saying that female co-worker dressed "sleazy" and "like a whore" were not so offensive as to constitute actionable harassment (internal quotation marks omitted)); Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1110-11 (9th Cir. 2000) (finding no hostile work environment where a supervisor called female employees "'castrating bitch[es]'"); Guerrero v. Lowe's Home Ctrs., Inc., 462 F. Supp. 2d 399, 408 (W.D.N.Y. 2006) (supervisor calling plaintiff a "'bitch'" was "clearly offensive but not particularly severe"), aff'd, 254 F. App'x 865 (2d Cir. 2007) (unpublished); Stepheny v. Brooklyn Hebrew Sch. for Special Children, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (finding utterance of "'white bitch'" or some variation thereof five times over a five-month period was not severe); Jumper v. Ind. State Police Dep't, No. IP 00-1929-C M/S, 2002 WL 31399094, at *17 (S.D. Ind. Sept. 30, 2002) (although supervisor's sexual remarks, including use of the word "'bitch,'" "were surely inappropriate and insensitive, Title VII does not prohibit boorish behavior").

Furthermore, plaintiff has not alleged that Koester ever touched her or propositioned her for sex.  Nor has she asserted that Koester sexually threatened or physically intimidated her. Koester did not even flirt with her or ogle her.  See Hartsell, 123 F.3d at 773 ("There is no allegation that [plaintiff] was inappropriately touched, propositioned, flirted with, taunted, or even ogled.").  Moreover, aside from the solitary "black bitch" comment that was directed at

30

plaintiff on 29 July 2009, Koester did not "target[]" plaintiff with "highly personalized comments designed to demean and humiliate her." <u>Fairbrook Med. Clinic</u>, 609 F.3d at 328. Finally, although Koester generally discussed "what he did the night before with whatever woman he was with"[19] (Pl.'s Dep., DE # 78-1, at 116:2-3) and referred to women as "hot" (J. Scott Dep., DE # 78-6, at 12:21-13:17), there is absolutely no evidence in the record that Koester made overt comments about female body parts, such as breasts, or that he graphically revealed or demonstrated the specific details of his sexual activities. Therefore, the court finds that Koester's alleged conduct lacks severity.

With regard to the issue of pervasiveness, much of plaintiff's evidence regarding the regularity or frequency of the harassment is too conclusory and non-specific to support her claim. "[A] hostile work environment plaintiff needs to allege sufficient specificity as to the time, place, and context of alleged discriminatory statements to create a genuine issue of material fact." <u>Tippie v. Tenn. Dep't of Rev.</u>, No. 10-2702-STA-dkv, 2012 WL 1900656, at *9 (W.D. Tenn. May 24, 2012); <u>see also</u> <u>Gilliam v. S.C. Dep't of Juvenile Justice</u>, 474 F.3d 134, 142-43 & n.9 (4th Cir. 2007) (unsupported, conclusory statements made by plaintiff and witnesses regarding differential treatment of plaintiff were insufficient to establish hostile work environment); <u>Causey v. Balog</u>, 162 F.3d 795, 802 (4th Cir. 1998) ("[C]onclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment."). Here, plaintiff's generalized evidence and allegations miss the mark. For example, plaintiff testified twice during her deposition that Koester was "always" making "lewd comments" (Pl.'s Dep., DE # 78-1, at 110:19-20; 205:2-3), but she has not provided any specifics other than those

---

[19] The court also notes that this testimony from plaintiff's deposition is so vague that it could be construed to mean that Koester told plaintiff that he took a woman out to dinner or to a movie. <u>See</u> discussion, <u>infra</u>, at 32-33.

31

relating to the four instances of sexually harassing conduct that have been previously described, see discussion, supra, at 28, and that she also once heard Koester refer to the Dal-Tile female employees as "his bitches" (id. at 205:5).[20]  See Fuelling v. New Vision Med. Labs. LLC, 284 F. App'x 247, 259 (6th Cir. 2008) (unpublished) (granting summary judgment to the defendant on a hostile work environment claim where the plaintiff failed to present evidence to substantiate her conclusion that offensive remarks, such as "'white bitch,'" were made "'numerous' times, 'often,' or 'regularly' during her two-year tenure"); Fasone v. Clinton Twp., 142 F.3d 433 (Table), No. 97-3267, 1998 WL 165147, at *1 (6th Cir. Apr. 3, 1998) (unpublished) (same where plaintiff alleged "constant harassment" but only identified "a few specific discriminatory comments").

In an attempt to establish pervasiveness, plaintiff also relies on Wrenn's testimony that Koester "always made comments about women.  I mean, he enjoyed women."  (S. Wrenn Dep., DE # 78-4, at 21:24-25.)  However, Wrenn's statements are too vague to provide a basis to

---

[20] Furthermore, it is clear from plaintiff's memorandum in opposition to the motion for summary judgment that plaintiff has chosen to provide the court with incomplete and misleading portions of testimony from various depositions, which have been taken out of context in a veiled attempt to support her position.  (See, e.g., Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 20.)  Although there are many such examples in plaintiff's memorandum, the court will provide only one example for the purposes of illustration.  While plaintiff cites to her testimony that Koester was "always" making "lewd comments" (id. at 1, 20) in support of her sexual harassment claim, she omitted her surrounding testimony, which reads as follows:

It became apparent to me that Tim would come into the office, he would not necessarily have direct conversations with me, but I would either see off from a distance or I would kind of hear him, you know, in an office somewhere speaking with someone else.

And there were times to where I can't say exactly but I knew that the -- based on the other person's reaction to him, I would see, you know, the rolling of the eyes or ahh, you know, Tim get away from me, because he was always coming in making some sort of lewd comments.

(Pl.'s Dep., DE # 78-1, at 110:9-20.)  It is evident from the context of this testimony that plaintiff assumed that Koester made lewd comments to her co-workers, but this conclusion is pure speculation on her part.  This testimony does not in any way substantiate plaintiff's conclusion that she was subjected to sexually offensive conduct on a regular, frequent basis.

32

determine whether Koester's behavior constitutes objectively offensive harassment. Wrenn's testimony regarding Koester's comments is as indicative of nonactionable conduct[21] as it is of potentially actionable harassment, and it provides no support for plaintiff's claim. See Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163, 315 F.3d 817, 822 (7th Cir. 2003) (in case brought pursuant to Title IX, student's general allegations that classmate "'bothered'" her by doing "'nasty stuff'" were too vague to support harassment claim); EEOC v. Int'l Profit Assocs. Inc., 654 F. Supp. 2d 767, 795 (N.D. Ill. 2009) ("Claims generically alleging comments 'of a sexual nature' are insufficiently precise to allow the court - or the fact finder - to 'provide a basis to determine whether that conduct was severe, pervasive, and objectively offensive harassment.'" (citation omitted)). This analysis also applies to Wrenn's testimony that Koester "liked to brag" about his "evening excursions, or his weekend excursions" and that "there were times where he would say something about what he did the night before that had sexual content to it." (S. Wrenn Dep., DE # 78-4, at 16:1-5.)

Furthermore, some of the record evidence contradicts plaintiff's claim of pervasive sexual harassment. For example, Wrenn testified that Koester showed pictures of naked women that he had on his phone, but when she was asked about the frequency with which Koester engaged in this behavior, she responded: "Not very often, to my knowledge. I mean, only a couple of times, as far as I'm concerned . . . ." (Id. at 19:11-12.) Plaintiff herself testified that there was only one occasion where Koester showed her a picture of a naked woman. (Pl.'s Dep., DE # 178-1, at 116:9-19.) In addition, plaintiff's co-worker Patrick Suggs ("Suggs") testified that Koester used the word "bitches" but "[n]ot often." (P. Suggs Dep., DE # 78-18, at 8:12-16.)

---

[21] For example, Wrenn's testimony could be construed to mean that Koester made comments about a particular woman being funny, intelligent, or kind.

He further testified that he never observed Koester showing people pictures of women. (Id. at 8:20-22.) Suggs never heard Koester make "sexual jokes"[22] or say anything that Suggs felt was inappropriate. (Id. at 8:23-25; id., DE # 79-3, at 9:8-10.) This testimony does not support a finding of pervasive harassment.

In viewing the evidence in the light most favorable to plaintiff with regard to the issue of pervasiveness, both Wrenn and Scott testified that Koester's portrayals of women as "bitches" and as being "hot" were not isolated occurrences. (See, e.g., S. Wrenn Dep., DE # 78-4, at 15:2-23; J. Scott Dep., DE # 78-6, at 10:15-11:4; 13:13-21; id. at DE # 79-2, at 14:13-19.) However, this testimony is too vague to allow the court to determine the extent to which these comments were directed at plaintiff.[23] Similarly, the court cannot determine whether the comments identified by Wrenn and Scott were made in plaintiff's presence[24] or whether plaintiff was ever even aware of the comments. See Fuelling, 284 F. App'x at 259 (co-workers' allegations regarding the existence of offensive comments were not relevant to plaintiff's hostile work environment claim because co-workers did not allege that plaintiff was aware of the comments

---

[22] Suggs did testify that he once heard Koester tell a "dirty joke," but he did not specifically describe the joke, nor did he explain how a "dirty joke" differs from a "sexual joke." (P. Suggs Dep., DE # 79-3, at 8:23-9:4.) He also stated that plaintiff was not present when Koester told the dirty joke. (Id. at 16:5-13.)

[23] For example, although Wrenn generally testified that Koester made remarks about "hot bitches" "more than once a month," she also testified that Koester's use of the word "bitch" "was never directed at us [i.e., Dal-Tile female employees.]" (S. Wrenn Dep., DE # 78-4, at 15:1; 15:4; 15:22.) Rather, Koester "typically was referring to his night on the town the night before." (Id. at 14:24-15:1.) Furthermore, Scott's testimony indicates that Koester did not use the word "hot" to describe plaintiff or other female employees of Dal-Tile. According to Scott, his use of the word appeared to be directed mainly at Dal-Tile customers. (See J. Scott Dep., DE # 78-6, at 12:21-13:17.)

[24] The court acknowledges that conduct targeted at persons other than plaintiff may be considered in support of a hostile work environment claim because, "[w]e are, after all, concerned with the 'environment' of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and [the harasser]." Spriggs, 242 F.3d at 184 (citing Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n.2 (11th Cir. 1982)). However, in Walker, one of the critical factors cited by the court in finding that epithets not directed at the plaintiff affected his work environment was that "[t]he offensive language often was used in [his] presence . . . ." Walker, 684 F.2d at 1359 n.2.

34

and because plaintiff herself did not claim that she was aware of those comments); Velez v.

QVC, Inc., 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002) (harassing incidents reported by other

employees do not bear on a plaintiff's hostile work environment claim in the absence of evidence

that plaintiff was aware of the incidents and that such incidents detrimentally affected plaintiff).

As a result, the testimony of Wrenn and Scott is insufficiently precise to allow a reasonable fact-

finder to conclude that Koester's conduct constitutes objectively pervasive harassment.[25]

Nevertheless, even if the court were to assume *arguendo* that plaintiff was aware of

Koester's use of the words "bitches" and "hot" as identified by Wrenn and Scott, the context in

which these words were spoken makes it clear that plaintiff's workplace was not objectively

"pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby

creating an abusive atmosphere." Cent. Wholesalers, 573 F.3d at 176 (citation and internal

quotation marks omitted). The undisputed evidence shows that plaintiff worked in an office with

a relaxed, informal atmosphere. (See, e.g., Pl.'s Dep., DE # 62-1, at 103:3-9; 104:3-106:22

("there was a lot of laughing" and "joking around with each other" when plaintiff was an

employee of Marble Point); id., DE # 78-1, at 90:19-24 (the working environment at Marble

Point was "very relaxed" and "close knit"); id., DE # 79-6, at 193:18-19 (plaintiff was "friendly"

with Koester as long as he was not making "lewd comments"); 194:4-195:13 (plaintiff was

---

[25] The court also notes that neither Wrenn nor Scott appeared to share plaintiff's discomfort with Koester's sexual comments and conduct. Cf. Jennings, 482 F.3d at 698 (In Title IX action, "[e]vidence that other players shared [plaintiff's] humiliation and discomfort assists in showing that she was objectively reasonable in finding the environment hostile and abusive."). Wrenn testified: "I just felt [Koester] was crude sometimes. You know, I don't think he was chauvinistic. I just think he doesn't have very much tact. I don't think there is anything malicious about it." (S. Wrenn Dep., DE # 78-4, at 16:8-11; see also id., DE # 79-5, at 60:11-13 ("[E]verybody knew that [Koester] ran his mouth, and, you know, like I said, it was never malice, it was never malicious.").) Furthermore, even though Scott heard Koester call women, including her own daughters, "hot" and also heard him use phrases like "Yo, bitch" and "What's up, bitches?" (J. Scott Dep., DE # 78-6, at 10:15-12:4; 12:21-13:17; id., DE # 79-2, at 14:15-19; 30:16), she testified that she did not have any problems working with Koester (id., DE # 79-2, at 25:13-15).

friendly with Koester's young daughter, who "would mainly sit at [plaintiff's] desk" when she came into the office); 250:19-24 (plaintiff was friends with Koester and other Dal-Tile employees on Facebook while she was employed by Dal-Tile); J. Scott Dep., DE # 79-2, at 18:24-25 ("[Plaintiff and Koester] were very comfortable with each other. My impression was they were friends.").) Plaintiff has not shown that Koester's conduct, within such an informal atmosphere, occurred with a sufficient degree of frequency to be considered pervasive. See Parisi v. Buffalo Mun. Hous. Auth., No. 01-CV-0171E(SR), 2003 WL 21382893, at *4 (W.D.N.Y. Feb. 14, 2003).

In sum, although it is evident that Koester's behavior during his visits to Dal-Tile was crude and insensitive, "[c]ourts have often found that even boorish and offensive behavior does not rise to the level of 'severe or pervasive' conduct and therefore does not support a hostile work environment claim." Brown v. Henderson, 155 F. Supp. 2d 502, 508 (M.D.N.C. 2000). Even when viewing the facts in the light most favorable to plaintiff, she has failed to produce sufficient evidence to support her racial and sexual hostile work environment claims. Plaintiff's evidence regarding the ongoing nature of the harassment is too vague and conclusory, and the specific isolated events that she has identified are not of the extremely serious variety sufficient to constitute a change in the terms or conditions of her employment. See Gleason, 118 F.3d at 1144 ("[T]here is a safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex." (emphasis in original) (citation and internal quotation marks omitted)); Hopkins, 77 F.3d at 753 (affirming summary judgment for employer on hostile work environment claim where plaintiff relied on conduct that was "temporally diffuse,

ambiguous, and often not directed specifically directed at him").  Under the totality of the circumstances shown here, the comments made by Koester in plaintiff's workplace, albeit inappropriate, do not rise to the level of an actionable claim of race-based or sexual-based harassment, and Dal-Tile is entitled to summary judgment on plaintiff's hostile work environment claims.

2. Imputing liability to the employer[26]

Even if it could be found that the alleged racial or sexual harassment by Koester was sufficiently severe or pervasive to alter the conditions of plaintiff's employment, Dal-Tile would still be entitled to summary judgment on all of plaintiff's hostile work environment claims because plaintiff cannot establish that liability for the harassment should be imputed to Dal-Tile. The Fourth Circuit Court of Appeals has yet to publish binding precedent on whether an employer may be liable for alleged harassment by a non-employee such as Koester.  However, other circuits have adopted a negligence standard, "finding that an employer can be liable if it took no steps to protect its employees and if it had actual or constructive knowledge of the situation."  EEOC v. Cromer Food Servs., Inc., 414 F. App'x 602, 606 (4th Cir. 2011) (unpublished); see also id. at 607 (adopting the negligence standard "[f]or the purposes of the instant litigation, and because both parties urge us to do so").  In other words, an employer is liable "if it knew or should have known of the harassment and failed to take appropriate actions to halt it."  Id. at 607.  "The negligence analysis can be divided into two separate inquiries,

---

[26] As an initial matter with respect to this issue, the court notes that it has considered Dal-Tile's argument that plaintiff has failed to plead sufficient facts to allow Dal-Tile to be held liable for harassment occurring prior to its acquisition of Marble Point.  For the reasons stated in plaintiff's memorandum in opposition to the motion for summary judgment, the court finds this argument to be without merit.  (See Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 28-29.)

looking first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses." Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001) (citation and internal quotation marks omitted).

a. Actual or constructive knowledge of harassment

Plaintiff initially argues that Wrenn had actual notice of Koester's harassing behavior prior to her 30 July 2009 complaint to Diksa, Dal-Tile's Regional Human Resources Manager. She appears to contend that she first complained to Wrenn in August or September 2006 when she overheard Koester as he walked into Wrenn's office and, referencing a photograph of two former employees, asked: "[W]ho are these two black bitches[?]" (Pl.'s Dep., DE # 78-1, at 108:12; see also Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 25 (plaintiff complained about the harassment "on at least two occasions prior to her final complaint to Diksa on July 30, 2009, but no action was taken and it continued" ).) Plaintiff alleges that her second complaint to Wrenn was made a significant time later, on 3 June 2009, after Koester said: "I'm just too fucked up, don't take offense, but I'm as fucked up as a nigger's checkbook." (Pl.'s Dep., DE # 78-1, at 139:13-15; see also id. at 141:13-143:8.)

However, plaintiff is mistaken in her characterization of her conversations with Wrenn as sufficient to put Dal-Tile on notice that it should have taken remedial action. Following the 2006 incident, plaintiff merely posed the following queries to Wrenn about Koester: "[W]ho was he and what was his deal[?]" and "[I]s that how he talks, is this what he does when he comes in here[?]" (Id. at 109:4-5; 109:9-10.) These questions in no way indicate that plaintiff considered

Koester's conduct to be harassment or that she was asking for an investigation by Dal-Tile.[27]  No reasonable fact-finder could conclude that plaintiff's questions to Wrenn were sufficiently specific to constitute a complaint about Koester's behavior.  Cf. Morrow v. Wal-Mart Stores, Inc., 152 F.3d 559, 562 (7th Cir. 1998) (in action alleging disparate treatment under Title VII, finding that no complaint of sexual harassment was ever lodged where plaintiffs told management about co-employee's history of off-color banter, but never reported that the co-employee's conduct made them uncomfortable or that they considered it to be harassment).

Following the 3 June 2009 incident, plaintiff immediately went to Wrenn and said, "Sara, let me tell you what [Koester] said to me.  He told me that he was as fucked up as a nigger's checkbook."  (Pl.'s Dep., DE # 78-1, at 141:25-142:2.)  Following plaintiff's description of Koester's remark, Wrenn "scoffed and shook her head and put her head back down and continued on with trying to pick the nail polish off of her nails or whatever it was that she was doing."  (Id. at 142:2-5.)  Construing the evidence in the light most favorable to plaintiff, this appears to be the extent of plaintiff's discussion with Wrenn about Koester's comment, either that day or at any other time.  (See id. at 144:12-145:6.)  Although plaintiff testified that she was upset by Wrenn's response (id. at 143:4-8), she did not say anything to Wrenn about that response or how it made her feel (id. at 145:7-9).  She did not approach Wrenn again about the issue, and she did not report the comment to anyone else at Dal-Tile.  (Id. at 144:19-20; id., DE # 62-1, at 151:1-4.)  As with the 2006 incident, no reasonable fact-finder could conclude that

---

[27] The next day, plaintiff told Koester that his remark made her feel very uncomfortable, and she asked him not to use that sort of language.  (Pl.'s Dep., DE # 78-1, at 107:19-21.)  However, because Koester would have no incentive to inform Dal-Tile of his actions, his knowledge of the harassment cannot be imputed to Dal-Tile.  See, e.g., Del Castillo v. Pathmark Stores, Inc., 941 F. Supp. 437, 439 (S.D.N.Y. 1996).

plaintiff's statement to Wrenn constituted a complaint, either formal or informal.[28]  As a result, there is insufficient evidence for the court to find that Dal-Tile had actual knowledge of Koester's harassment prior to 30 July 2009.

Plaintiff has also failed to present sufficient evidence to show that Dal-Tile had constructive notice of the harassment.[29]  Although Wrenn knew that Koester was "crude" and "tactless," she felt that his behavior was not "malicious," and that "[i]t was never directed at us [*i.e.*, female Dal-Tile employees]."  (S. Wrenn Dep., DE # 78-4, at 15:1; 16:8-12.)  Wrenn also testified that plaintiff and Koester "had a relationship where they gave each other crap back and forth all the time."  (Id., DE # 79-5, at 59:5-6.)  Thus, there is no evidence in the record which shows that Wrenn should have known that Koester's conduct seriously troubled plaintiff prior to her 30 July 2009 complaint to Diksa.[30]

Furthermore, even if the court were to assume *arguendo* that the above-referenced remarks that plaintiff made to Wrenn could somehow be construed as complaints, it is undisputed that plaintiff knew there were additional avenues that she could have pursued if she was unsatisfied with Wrenn's response.  (Pl.'s Dep., DE # 62-1, at 127:10-23; 131:22-136:13 &

---

[28] To the extent plaintiff is arguing that she made more than two complaints to Wrenn (see Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 25 (plaintiff "complained to Wrenn on a variety of occasions about Koester, including at the beginning of her employment, to no avail")), there is no evidence in the record to support this contention.

[29] The court notes plaintiff's allegation that Koester was "well known for his harassing conduct and inappropriate behavior among local businesses in the marble/tile industry."  (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 25 & Ex. II, DE # 78-35.)  However, the undisputed evidence shows that neither Wrenn, Diksa, nor Maslowski knew about Koester's conduct at other businesses prior to plaintiff's 30 July 2009 complaint to Diksa. (See S. Maslowski Dep., DE # 78-3, at 29:16-18; S. Wrenn Dep., DE # 78-4, at 18:11-20; C. Diksa Dep., DE # 78-5, at 40:13-15; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00101.)

[30] This conclusion is reinforced by plaintiff's testimony that the day after she told Wrenn about Koester calling her a "black bitch," Wrenn stated that she did not know that Koester's comment had upset plaintiff so badly. (Pl.'s Dep., DE # 78-1, at 191:3-4.)

40

Exs. 5-8.) "An employee has a duty to take reasonable steps to prevent harassment and mitigate harm." See Cross v. Prairie Meadows Racetrack & Casino, Inc., 615 F.3d 977, 983 (8th Cir. 2010) (citing Faragher, 524 U.S. at 806-07.)[31] "When, as here, there are multiple effective avenues for reporting misconduct, '[a] reasonable person, realizing that her [initial] complaints were ineffective, would then seek a remedy elsewhere.'" Id. (alterations in original) (quoting Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1038 (7th Cir. 1998)); see also Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div., 512 F.3d 157, 165 (5th Cir. 2007) ("In most cases, . . . once an employee knows his initial complaint is ineffective, it is unreasonable for him not to file a second complaint, so long as the employer has provided multiple avenues for such a complaint.").

Initially, plaintiff may have expected Wrenn to take her remarks about Koester more seriously and forward them to Human Resources or someone in upper-level management. This expectation, however, became less reasonable after plaintiff learned that Wrenn was unlikely to convey her reports to anyone else. An employee is expected to avail herself of available alternative reporting avenues, but, here, plaintiff has provided no explanation for why she failed to complain to Diksa prior to 30 July 2009. Under these circumstances, plaintiff cannot be said to have appropriately avoided harm, and Dal-Tile cannot be said to have been aware of the

---

[31] The court notes that Cross, as well as other cases cited in this opinion regarding the issue of employer liability, involved a related context of harassment by a supervisor. In such cases, an employer can establish an affirmative defense to vicarious liability by showing in part that an employee unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided. See Faragher, 524 U.S. at 806-07; Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998); Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266-67 (4th Cir. 2001). Although a different standard is used in cases involving non-employee harassment, where courts have generally applied an ordinary negligence standard, there are similar concerns at issue in both categories of cases. See, e.g., Wilson v. Tulsa Junior Coll., 164 F.3d 534, 540 n.4 (10th Cir. 1998) ("many of the same facts will be relevant to both negligence and vicarious liability claims"). For example, an appropriate balance must be struck between preventing workplace harassment and giving employers a reasonable opportunity to cure it.

harassment. As a result, no reasonable fact-finder could conclude that Dal-Tile had actual or constructive knowledge of Koester's harassing behavior until plaintiff made a formal complaint to Diksa.

## 2. Appropriateness of Dal-Tile's response

The second inquiry in the negligence analysis relates to the adequacy of the employer's remedial and preventative responses. In determining the "appropriateness" of an employer's response, no bright-line rule exists. Turnbull, 255 F.3d at 1245 (citation and internal quotation marks omitted). Rather, the inquiry should be whether the response "was reasonable under the circumstances." Id. "Key factors in that determination are the promptness and effectiveness of any action." Id. However, because it is not possible in every instance to completely eliminate offensive behavior, the effectiveness inquiry should look, "not to whether offensive behavior actually ceased but to whether the remedial and preventative action was reasonably calculated to end the harassment." Id. (citation and internal quotation marks omitted).

Plaintiff initially contends that there is a genuine dispute of material fact "as to whether Dal-Tile took any measures to end the harassment, let alone effective measures . . . ." (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 26 (emphasis in original).) However, the record clearly shows that Diksa investigated the 30 July 2009 complaint by interviewing plaintiff, Wrenn, and plaintiff's co-worker, Pendry. (See, e.g., C. Diksa Dep., DE # 62-2, at 19:3-28:8; C. Diksa Aff., DE # 62-11, ¶¶ 25-27; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00100-01.) Diksa also advised Maslowski of plaintiff's complaint. (See, e.g., S. Maslowski Dep., DE # 62-7, at 13:6-9; C. Diksa Aff., DE # 62-11, ¶ 28; C. Diksa Dep., DE # 78-5, at 26:13-21; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00101.)

The record also demonstrates that after discussing the matter with plaintiff and Diksa, Wrenn told Koester: "'Until this is sorted out, . . . you are not to come back here.'" (S. Wrenn Dep., DE # 78-4, at 31:7-8.) Wrenn also told Vose that Koester was "to not come around until we sort this out." (Id. at 32:12-13; see also S. Maslowski Dep., DE # 78-3, at 25:22-24 ("I believe we would have asked Vostone to just minimize [Koester] coming into the building until we could get to a resolution.").) That Wrenn did in fact convey this information to Koester and VoStone is made evident by Izzi's 12 August 2009 email, which stated: "[Y]ou have communicated to us that Tim [Koester], a Vostone Sales Rep., is no[] longer welcome to visit your premises." (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. P, DE # 78-16, at 00106.) Izzi concluded the email by stating: "[W]e need to know officially what is your final position on this issue." (Id. at 00107.)

Consequently, on 17 or 18 August 2009, Maslowski, Izzi, and plaintiff met to discuss a potential course of action that would both protect plaintiff and maintain Dal-Tile's business relationship with VoStone. (M. Izzi Dep., DE # 62-5, at 18:19-19:11; 21:14-23:18; S. Maslowski Dep., DE # 62-7, at 23:9-26:2; Pl.'s Dep., DE # 78-1, at 218:8-221:25.) Finally, on 31 August 2009, Diksa sent a letter to Izzi regarding the restrictions that Dal-Tile had decided to impose on Koester.[32] (C. Diksa Dep., DE # 62-2, at 34:1-9; 35:3-6 & Ex. 5; C. Diksa Aff., DE #

_____

[32] The court acknowledges that Dal-Tile has not provided a clear explanation as to how it arrived at the decision to issue the 31 August 2009 letter. Diksa testified that the underlying decision to place restrictions on Koester "was actually agreed upon between Scott Maslowski and Marco Izzi." (C. Diksa Dep., DE # 62-2, at 31:18-19; see also C. Diksa Aff., DE # 62-11, ¶ 31.) When Maslowski was asked whether he instructed Diksa to write the letter, he answered: "I don't know if I would have instructed her. We would have discussed it, most likely, and she would have told me what she believed the next step would probably be, or should be." (S. Maslowski Dep., DE # 78-3, at 27:16-19.) Maslowski further testified that the decision on what to do next would have been "a joint decision" between himself and Diksa. (Id. at 27:23-24.) However, he did not believe that such a decision had been made prior to plaintiff's 2 September 2009 departure on medical leave because they were waiting for a response from plaintiff following the 17 or 18 August 2009 meeting. (Id. at 27:2-5.) This lack of clarity is insufficient to

(continued...)

43

62-11, ¶ 32 & Ex. J; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00101-02; id., Ex. T, DE # 78-20.) Diksa stated that Dal-Tile would not tolerate Koester's behavior, and Koester was directed to have no contact with plaintiff for six months. (C. Diksa Dep., DE # 62-2, Ex. 5; C. Diksa Aff., DE # 62-11, Ex. J; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. T, DE # 78-20.) To ensure that plaintiff did not have to interact with Koester, Diksa further stated that Wrenn would accompany Koester into Dal-Tile's facility when necessary.[33] (Id.) Moreover, it is clear that Izzi received the 31 August 2009 letter. (M. Izzi Dep., DE # 79-9, at 27:10-20.) Koester also testified that he "was told [he] was not allowed to go near [plaintiff] anymore." (T. Koester Dep., DE # 62-6, at 53:23-24.) Thus, plaintiff's argument regarding Dal-Tile's failure to take any remedial measures whatsoever is without merit.

In addition, plaintiff takes issue with the timing of Dal-Tile's investigation. For example, she points out that no immediate action was taken when she reported Koester's "black bitch" comment to Wrenn on 29 July 2009. Plaintiff also argues that Diksa did not really begin her investigation until 11 August 2009, approximately two weeks after the 30 July 2009 complaint was made.[34] To constitute prompt remedial action, an employer's response to a harassment

---

[32](...continued)
raise a genuine dispute of material fact regarding the appropriateness of Dal-Tile's response to plaintiff's complaint. Regardless of whether the 31 August 2009 letter was an interim measure or Dal-Tile's final, official position, it is undisputed that the letter was sent to Izzi and was received by him, that Koester was told that he was not allowed to go near plaintiff anymore, and that there were no further acts of harassment during the remainder of plaintiff's employment with Dal-Tile. (See Pl.'s Dep., DE # 62-1, at 249:18-250:18; 253:14-21; 273:25-275:12; C. Diksa Dep., DE # 62-2, at 34:1-9; 35:3-6; C. Diksa Aff., DE # 62-11, ¶ 32 & Ex. J; T. Koester Dep., DE # 62-6, at 53:23-24; M. Izzi Dep., DE # 79-9, at 27:10-20.)

[33] During her deposition, Diksa also testified that Koester was supposed to contact Wrenn through her cell phone if he needed to visit Dal-Tile. (C. Diksa Dep., DE # 62-2, at 30:16-31:12; see also C. Diksa Aff., DE # 62-11, ¶ 35; Pl.'s Dep., # 78-1, at 242:10-18; id., DE # 62-1, Ex. 4, at 00087.)

[34] Plaintiff further claims that there is a dispute regarding the date that Diksa learned of plaintiff's complaint. (See Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 6, 26.) The court disagrees with plaintiff's

(continued...)

complaint must be "reasonably calculated" to end the harassment. Turnbull, 255 F.3d at 1245 (citation and internal quotation marks omitted). Thus, "'an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint.'" Olson v. Lowe's Home Ctrs. Inc., 130 F. App'x 380, 392 (11th Cir. 2005) (unpublished) (quoting Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1314 (11th Cir. 2001)); see also Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309 (5th Cir. 1987) ("Since the demise of the institution of dueling, society has seldom provided instantaneous redress for dishonorable conduct."). In this case, the investigation moved quickly, and Diksa's letter to Izzi regarding the restrictions that Dal-Tile had decided to impose on Koester was sent approximately one month after plaintiff made her complaint.

Furthermore, "[w]hat is reasonable depends on the gravity of the harassment. . . . [A]n employer is required to take more care, other things being equal, to protect its . . . employees from serious . . . harassment than to protect them from trivial harassment." McPherson v. HCA-HealthOne, LLC., 202 F. Supp. 2d 1156, 1175 (D. Colo. 2002) (second alteration in original) (citation and internal quotation marks omitted). Here, Koester's 29 July 2009 "black bitch" comment did not rise to a level that would have required Dal-Tile to take immediate action. See Milligan v. Bd. of Trs. of S. Ill. Univ., 686 F.3d 378, 383 (7th Cir. 2012). Given the facts and circumstances before it, Dal-Tile's response was appropriately prompt.

Plaintiff also contends that Dal-Tile "put[] pressure" on her during the 17 or 18 August 2009 meeting to find a way to allow Koester to continue his work at Dal-Tile. (Pl.'s Mem.

_____

[34](...continued)
assessment, but, in any event, the court has stated the facts in the light most favorable to plaintiff and has assumed that the complaint was made to Diksa on 30 July 2009.

45

Opp'n Mot. Summ. J., DE # 78, at 26.) In some cases, discouraging an employee from pursuing a complaint "might be sufficient to render an employer's response unreasonable, especially if coupled with a stalled or biased investigation." Milligan, 686 F.3d at 384. However, plaintiff's own testimony demonstrates that it was Izzi who asked plaintiff during the meeting whether a public apology from Koester would suffice. (Pl.'s Dep., DE # 78-1, at 219:18-221:10.) There is no evidence that anyone at Dal-Tile discouraged plaintiff from pursuing her complaint. Moreover, the letter delineating the restrictions placed on Koester was sent approximately two weeks after the meeting was held, thereby demonstrating that the investigation was neither stalled nor biased.

Next, plaintiff argues that Dal-Tile's response was ineffective because it did not prevent all contact between her and Koester. For example, the evidence demonstrates that following plaintiff's 30 July 2009 complaint, Koester sent plaintiff one work-related email. He also talked briefly to her once on the phone about a work-related matter, and he called Dal-Tile's general office line on other occasions[35] in August 2009 while Dal-Tile was investigating plaintiff's claims of harassment. (See, e.g., Pl.'s Dep., DE # 62-1, at 236:1-237:5; id., DE # 78-1, at 197:19-21; 232:19-234:25; 237:6-20; 245:23-246:16; T. Koester Dep., DE # 62-6, at 23:16-24:4 & Ex. 11; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. S, DE # 78-19.) This argument fails because Dal-Tile "was not required to completely insulate" plaintiff from Koester. Milligan, 686 F.3d at 385; see also Sutherland v. Wal-Mart Stores, Inc., 632 F.3d 990, 993, 995 (7th Cir. 2011) (holding that the employer's response was reasonable even where the harassed employee

---

[35] The court notes that it is clear from the record that even though plaintiff saw Koester's number appear on Dal-Tile's general office line more than once in August 2009, she only answered the phone and spoke with him on one of those occasions. (See Pl.'s Dep., DE # 78-1, at 197:19-21; 232:19-234:25; 237:6-20; id., DE # 62-1, at 236:1-237:5; 249:25-250:5.)

periodically had to work in the harasser's general vicinity); Landgraf v. USI Film Prods., 968

F.2d 427, 430 (5th Cir. 1992) ("Title VII does not require that an employer use the most serious

sanction to punish an offender . . . .), aff'd on other grounds, 511 U.S. 244 (1994);

Dominicak-Brutus v. Urban Prop. Servs. Co., 217 F. Supp. 2d 911, 923 (N.D. Ill. 2002) ("An

employer informed of harassment . . . does not need to take the actions that the victim would like

him to take (*e.g.* suspension, termination).").

Rather, the law required only that Dal-Tile's response be "reasonably likely to prevent

future harassment." Milligan, 686 F.3d at 385 (citation and internal quotation marks omitted);

see also Saxton v. Am. Tel. & Tel. Co., 10 F.3d 526, 536 (7th Cir. 1993) ("Whatever reasons

there might be for the company's failure to take additional steps . . . are irrelevant absent

evidence suggesting that the [action taken] was not reasonably likely to prevent the harassment

from recurring."). Here, Dal-Tile's good faith efforts to minimize plaintiff's contact with

Koester were sufficient under the circumstances. Koester did not enter Dal-Tile's office building

at any time when plaintiff was present from the date of her complaint to Diksa until her last day

of employment with the company. (Pl.'s Dep., DE # 62-1, at 249:18-24; 273:25-274:3; 274:25-

275:2; 275:10-12; id., DE # 78-1, at 245:17-246:1.) Aside from the limited business-related

communications previously described, plaintiff had no other communications or contact with

Koester from 30 July 2009 forward. In fact, plaintiff suffered no further sexual or racial

harassment after she complained to Diksa about Koester's behavior. (Id., DE # 62-1, at 249:18-

250:18; 253:14-21; 273:25-275:12.) See Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 637 (7th

Cir. 2009) ("There is no question that a stoppage of harassment shows effectiveness.") (citation

and internal quotation marks omitted); Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir.

1999) ("Factors in assessing the reasonableness of remedial measures may include . . . whether or not the measures ended the harassment." (internal citations omitted)); Mackenzie v. Potter, No. 04 C 4070, 2006 WL 1005127, at *9 (N.D. Ill. Apr. 14, 2006) ("[W]e conclude that the [employer's] response was reasonably likely to prevent future harassment, particularly as it did so."), aff'd, 219 F. App'x 500 (7th Cir. 2007); McPherson, 202 F. Supp. 2d at 1177 ("The effectiveness of the hospital's measures is demonstrated by the fact that plaintiff has presented no evidence that any further incidents occurred . . . .").

The court acknowledges that its determination in this regard could have been made easier if Dal-Tile had kept plaintiff updated on the status of the investigation and if it had used more precise language[36] when describing the actions that might be taken against Koester.  See

---

[36] For example, plaintiff bemoans the fact that Koester was never "banned" as Diksa stated he would be. (Pl.'s Dep., DE # 78-1, at 169:1; see also, e.g., id. at 202:8-10; Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 7, 12, 24, 27-28, 31-33.)  Although plaintiff argues that the word "banned" has "a very plain meaning" (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 31), she herself asked for "clarification" "explaining what the meaning of the ban is" in her 5 August 2009 email to Diksa and Wrenn following Koester's 4 August 2009 visit to pick up product that was placed outside Dal-Tile's office building.  (Pl.'s Mem. Opp'n Mot. Summ. J., Ex. N, DE # 78-14.)

The court notes that the word "ban" simply means "to prohibit."  Webster's Third New Int'l Dictionary (Unabridged) 169 (1993) (defining "ban" as "to prohibit, esp[ecially] by legal means or social pressure the performance, activities, dissemination, or use of"); Black's Law Dictionary 164 (9th ed. 2009) (defining "ban" as "[t]o prohibit, esp[ecially] by legal means").  Bans may take on various forms.  They may be permanent or temporary, they may prohibit certain forms of communication (e.g., communication over the telephone), but not others (e.g., communication by letter or email), or they may encompass any number of different physical, temporal, or geographic restrictions (e.g., a restraining order which bans contact within a certain number of feet).  Here, plaintiff appears to be asking the court to infer that Dal-Tile "promised" (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 9, 12, 24, 27, 31) her an immediate, permanent ban that would keep her from ever having to communicate with or physically encounter Koester again.  However, even when viewing the facts in the light most favorable to plaintiff, the record does not support such a finding.  (See, e.g., Pl.'s Dep., DE # 62-1, at 212:1-12; S. Wrenn Dep., DE # 78-4, at 31:18-32:4.)

Moreover, the 31 August 2009 letter sent by Diksa did in fact ban Koester from having any contact with plaintiff for six months.  (C. Diksa Dep., DE # 62-2, Ex. 5; C. Diksa Aff., DE # 62-11, ¶ 32 & Ex. J; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. T, DE # 78-20 ("[T]hrough the next 6 months, your employee is not to have any contact with our employee, including over the phone.").)  Koester was also essentially banned from entering Dal-Tile's office building while plaintiff's complaint was being investigated.  Wrenn told Koester: "'Until this is sorted out, . . . you are not to come back here.'" (S. Wrenn Dep., DE # 78-4, at 31:7-8.)  Wrenn also told Vose that Koester was "to not come around until we sort this out."  (Id. at 32:12-13; see also S. Maslowski Dep., DE # 78-3, at 25:22-24 ("I believe we would have asked Vostone to just minimize [Koester] coming into the building until we could get to a resolution.").)  Although plaintiff saw Koester outside the facility on two occasions (see Pl.'s Dep., DE # 62-1, at

(continued...)

Williams v. Waste Mgmt. of Ill., 361 F.3d 1021, 1030-31 (7th Cir. 2004) (affirming summary judgment where employer's process was imperfect, but not negligent); Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 978 (7th Cir. 2004) (same). However, the court does not "sit as a super-personnel department," and the court need not second-guess Dal-Tile's prompt and effective response under these circumstances. Wyninger, 361 F.3d at 978 (citation and internal quotation marks omitted); see also Crawford v. BNSF Ry. Co., 665 F.3d 978, 984 (8th Cir.) ("We afford an appropriate degree of deference to business judgment where the record shows that the employer conducted a reasonable investigation in good faith, as here." (citation and internal quotation marks omitted)), cert. denied, 133 S. Ct. 144 (2012).

Finally, plaintiff maintains that Dal-Tile cannot "take credit" for ending the harassment, making much of the fact that she "removed herself from Koester's presence" by taking a short-term disability leave starting 2 September 2009. (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 28 (emphasis in original) (internal quotation marks omitted).) "Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care." Smith v. Sheahan, 189 F.3d 529, 535 (7th Cir. 1999). In this case, however, no reasonable jury could find that Dal-Tile's response fell below the level of due care. The record indisputably shows that Dal-Tile promptly conducted an investigation after plaintiff formally

---

[36](...continued)

246:21-249:24; id., DE # 78-1, 197:9-198:6; 231:25-232:12; 240:11-20), she does not allege that Koester ever entered Dal-Tile's office building while her complaint was being investigated. No fact-finder could ignore these undisputed facts regarding Dal-Tile's prompt action that had both the purpose and effect of eliminating further harassment. Thus, although Dal-Tile could have been clearer with plaintiff about the implementation, duration, and scope of the ban, this does not create a genuine dispute of material fact as to whether Dal-Tile responded negligently to her complaint.

complained, told Koester to stay away, and issued a letter delineating its remedial action about four weeks later. As a result, the court rejects plaintiff's argument with respect to this issue.

In sum, even if the incidents at issue in this case were found to have been so severe or pervasive that they altered the terms and conditions of plaintiff's employment, the undisputed facts reflect that Dal-Tile did not act negligently with regard to either plaintiff's complaint or Koester's conduct. Instead, the record demonstrates that Dal-Tile acted promptly and reasonably as soon as it was informed by plaintiff that a problem existed. Accordingly, plaintiff's claims that are based on a hostile working environment, which include the first, second, and third counts of the amended complaint, will be dismissed.

D.    Constructive Discharge

Plaintiff further claims that the actions of Dal-Tile resulted in her constructive discharge.[37] In this case, plaintiff returned to work following her medical leave of absence on or about 19 November 2009, and she tendered her letter of resignation to Dal-Tile on 7 December 2009. (See C. Diksa Aff., DE # 62-11, ¶¶ 42, 44 & Ex. M; Pl.'s Dep., DE # 78-1, at 281:14-22; Pl.'s Mem. Opp'n Mot. Summ. J., Ex. J, DE # 78-10, at 00102; id., Ex. FF, DE # 78-32.) Her letter did not contain an explanation for her decision to resign, but plaintiff testified during her deposition that she resigned because the depression and anxiety became too much for her. (Pl.'s Dep., DE # 78-1, at 281:23-282:1.) According to plaintiff, she "just always had this sense [that] even though [Koester] was fired from VoStone, regardless of where he worked, he still had the

---

[37] The court notes that plaintiff has brought her constructive discharge claim solely under 42 U.S.C. § 1981, which prohibits discrimination based on race. Although Title VII's EEOC charge process does not apply to a section 1981 claim, courts analyze race discrimination claims under Title VII and section 1981 using the same analytic framework. See, e.g., Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543-45 (4th Cir. 2003). Thus, Title VII constructive discharge principles also apply to section 1981 claims.

ability to come [to the Stoneyard]." (Id. at 282:1-3; see also id. at 273:14-15.)

To establish constructive discharge, plaintiff must demonstrate that Dal-Tile deliberately made her working conditions "'intolerable' in an effort to induce [her] to quit." Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 272 (4th Cir. 2001) (alteration in original) (citation and internal quotation marks omitted). This requires her to prove two elements: (1) the deliberateness of Dal-Tile's actions, motivated by racial bias, and (2) the objective intolerability of the working conditions. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186-87 (4th Cir. 2004). "The law is well-settled that a claim of constructive discharge requires proof of working conditions that are even harsher than those required to state a claim of hostile work environment." Tinsley v. Astrue, No. 3:10-cv-01184, 2012 WL 5377881, at *8 (S.D. W. Va. Aug. 15, 2012) (collecting cases) (report and recommendation), adopted, 2012 WL 5381678 (S.D. W. Va. Oct. 31, 2012). Unlike the hostile work environment analysis, there is no subjective component to the constructive discharge inquiry. See Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). Rather, a plaintiff alleging constructive discharge "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Id.

Here, the undisputed evidence does not support a finding of constructive discharge. Although the evidence indicates that plaintiff was unhappy with Dal-Tile's response to her complaint, she suffered no further sexual or racial harassment after she complained to Diksa about Koester's behavior on 30 July 2009. (See Pl.'s Dep., DE # 62-1, at 249:18-250:18; 253:14-21; 273:25-275:12.) In the complete absence of any improper conduct after plaintiff returned from leave in November 2009, the court concludes that her resignation was not "a fitting response." Suders, 542 U.S. at 134.

Furthermore, as the court has already found, Dal-Tile was not required to completely insulate plaintiff from Koester. See discussion, supra, at 46-47. Thus, the mere possibility of Koester's presence in the workplace does not rise to the level of an objectively intolerable working condition. In addition, plaintiff's fear of future harassment by Koester (see Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 34) was purely speculative and cannot form a basis for her constructive discharge claim. See Dent v. Davaco, Inc., Civ. A. No. 3:08-CV-1713-M, 2009 WL 5126107, at *5 (N.D. Tex. Dec. 29, 2009) ("[F]ear of future conduct is not sufficient to support a claim of constructive discharge; 'a plaintiff must demonstrate that existing conditions were such that a reasonable person would contemplate immediate departure.'" (quoting Dawkins v. United Airlines, Inc., No. 91 C 8772, 1993 WL 339051, at *8 (N.D. Ill. Aug. 30, 1993)).

Plaintiff is also unable to show that anyone at Dal-Tile acted deliberately with an unlawful discriminatory intent in order to force her to resign either before or after she returned from medical leave. Rather than being constructively discharged, the record in this case establishes that plaintiff voluntarily resigned her position at Dal-Tile. As a result, Dal-Tile is entitled to summary judgment with respect to this claim.

E.    Retaliation

Plaintiff also asserts separate claims of retaliatory demotion and retaliatory discharge pursuant to 42 U.S.C. § 1981.[38] Because plaintiff has not brought forth any direct evidence of retaliation, her race retaliation claims must proceed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Dowe v. Total Action Against

---

[38] As with her constructive discharge claim, plaintiff has brought her race retaliation claims solely under 42 U.S.C. § 1981. The analysis for retaliation claims brought pursuant to 42 U.S.C. § 1981 and Title VII is the same. See, e.g., Jordan v. Alt. Res. Corp., 458 F.3d 332, 343-44 (4th Cir. 2006).

Poverty in Roanoke Valley, 145 F.3d 653, 656 (4th Cir. 1998); Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). Under McDonnell Douglas, plaintiff must first establish a *prima facie* case of retaliation, whereupon the burden shifts to the employer to establish a legitimate non-retaliatory reason for the adverse action. See Williams, 871 F.2d at 457. If Dal-Tile sets forth a legitimate, non-retaliatory explanation for the action, plaintiff must then show that the employer's proffered reasons are pretextual, or her claim will fail. Id.

Here, plaintiff appears to concede that summary judgment is appropriate on these claims because she has failed to respond to the arguments raised with respect to the issue of retaliation in Dal-Tile's memorandum in support of the motion for summary judgment. See, e.g., Bayer Schering Pharma AG v. Watson Pharms., Inc., Nos. 2:07-CV-01472-KJD-GWF, 2:08-CV-00995-KJD-GWF, 2012 WL 1079574, at *7 (D. Nev. Mar. 30, 2012) (failure to oppose movant's argument in brief opposing motion for summary judgment implicitly concedes the argument (citing S. Nev. Shell Dealers Ass'n v. Shell Oil Co., 725 F. Supp. 1104, 1109 (D. Nev. 1989)); Ferdinand-Davenport v. Children's Guild, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (plaintiff abandoned claim by failing to respond to defendant's argument); Klugel v. Small, 519 F. Supp. 2d 66, 72 (D.D.C. 2007) ("[W]hen a party does not address arguments raised by a movant, the court may treat those arguments as conceded.").

However, even if plaintiff had not made such a concession, her retaliation claims would still fail as a matter of law. To demonstrate a *prima facie* case of retaliation, plaintiff must show (1) engagement in a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action. Dowe, 145 F.3d at 656; Williams, 871 F.2d at 457. With respect to her retaliatory discharge claim, plaintiff cannot establish at

53

least one of the required elements of the claim. She cannot show that an adverse employment action was taken against her, *i.e.*, that she was discharged. As discussed previously in Section II.D, supra, the court has found that plaintiff was not constructively discharged. Rather, she voluntarily resigned from her position. Therefore, the retaliatory discharge claim must be dismissed.

The court also finds that plaintiff cannot succeed on her retaliatory demotion claim. In May 2009, plaintiff was promoted to the role of Sales Consultant. (See C. Diksa Aff., DE # 62-11, ¶ 13 & Ex. E.) In November 2009, plaintiff's position was reclassified to Customer Service Representative. (Id. ¶¶ 19-20 & Exs. F, G.) This job reclassification did not affect plaintiff's pay grade, earnings, or employee benefits. (Id. ¶ 20.)

Even if plaintiff could demonstrate a *prima facie* case with respect to this claim, a prospect which the court finds extremely doubtful, Dal-Tile has offered a legitimate non-retaliatory reason for its actions. Specifically, the newly-created Sales Consultant position was not working well in the Stoneyard where, due to the nature of the business, there were simply not enough unassigned house accounts for plaintiff to handle in her inside sales role. (Id. ¶¶ 15-16, 40.) As a result, plaintiff's position was reclassified, which was consistent with the removal of the Sales Consultant position from other Dal-Tile sales service centers where the inside sales role did not work out.[39] (Id. ¶¶15, 18.) Diksa has also testified that she did not have any knowledge of plaintiff's 28 October 2009 EEOC charge when she approved the reclassification of plaintiff's position on 2 November 2009. (Id. ¶ 40.) Furthermore, plaintiff has provided

---

[39] For example, in November 2009 – the same month in which plaintiff's position was reclassified – a Caucasian male employee, Mark Haddon, was also reclassified from Sales Consultant to Customer Service Representative when the inside sales role was removed from the sales service center where he worked. (C. Diksa. Aff., DE # 62-11, ¶¶18-19, 41 & Ex. F.)

absolutely no evidence to show that the legitimate non-retaliatory reasons proffered by Dal-Tile are pretextual. Thus, Dal-Tile is entitled to summary judgment on plaintiff's retaliatory demotion claim.

F.     Obstruction of Justice

Plaintiff also asserts an obstruction of justice claim pursuant to North Carolina law. She maintains that Dal-Tile failed to issue a litigation hold after it received her 28 October 2009 EEOC charge. Dal-Tile did not issue a litigation hold until August 2010, and then it removed the litigation hold in October 2010. (See Pl.'s Mem. Opp'n Mot. Summ. J., Ex. GG, DE # 78-33; J. Jensen Aff., DE # 78-34, ¶ 4.) As a result, Dal-Tile destroyed a significant number of emails pursuant to its email retention policy, which provides for the automatic deletion of emails over six months old. (See Pl.'s Mem. Opp'n Mot. Summ. J., Ex. EE, DE # 78-31; see also id., Ex. OO, DE # 78-41, at 11-12.) Plaintiff claims that the destroyed emails "could undermine [Dal-Tile's] claims . . . about the measures it took, and what it knew about Koester and when, along with its failure over the prior years to take any action in response to Koester's known harassment." (Id., DE # 78, at 40.)

In order to establish a claim for common law obstruction of justice, a plaintiff must show some "action intentionally undertaken by the defendant for the purpose of obstructing, impeding, or hindering the plaintiff's ability to seek and obtain a legal remedy . . . ." Blackburn v. Carbone, 703 S.E.2d 788, 795 (N.C. Ct. App. 2010) (emphasis added); see also J.W. v. Johnston Cnty. Bd. of Educ., No. 5:11-CV-707-D, 2012 WL 4425439, at *11 (E.D.N.C. Sept. 24, 2012) (under North Carolina law, "[o]bstruction of justice is an intentional act"). This depends on the alleged wrongdoer's mental state regarding any obligation to preserve evidence and the

subsequent destruction. In this case, the evidence does not support a finding that anyone at Dal-Tile intentionally destroyed emails in order to keep plaintiff from proceeding with a legal claim. Plaintiff herself makes it clear that she can point to no such intentional act. (See Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 15 (Dal-Tile "did nothing to stop the routine destruction" of emails); 16 ("[r]elevant decision makers knew or should have known their failure to act would result in the destruction of evidence"); 17 (discussing Dal-Tile's "deliberate indifference").)[40]

Furthermore, "[i]t is a well-established principle of law that proof of damages must be made with reasonable certainty" and that "[t]he burden of proving damages is on the party seeking them." Olivetti Corp. v. Ames Bus. Sys., Inc., 356 S.E.2d 578, 585, 586 (N.C. 1987); see also Lieb v. Mayer, 94 S.E.2d 658, 660 (N.C. 1956). "[W]here actual pecuniary damages are sought, there must be evidence of their existence and extent, and some data from which they may be computed." Norwood v. Carter, 87 S.E.2d 2, 5 (N.C. 1955) (citation and internal quotation marks omitted). "No substantial recovery may be based on mere guesswork or inference." Id. (citation and internal quotation marks omitted); see also Lieb, 94 S.E.2d at 660. In this case, plaintiff would have to prove that the breach of duty to preserve evidence caused damage to her position, and she would also have to prove the amount of those damages.

However, plaintiff's claim could not be proved without multiple levels of speculation or guesswork. For example, there would be questions as to whether the destroyed emails would

_____

[40] The court also notes that the cases cited by plaintiff in support of her obstruction of justice claim relate to the standard that federal courts apply in determining whether sanctions, such as the giving of an adverse inference instruction at trial, should be imposed for spoliation of evidence. See Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 530 (D. Md. 2010); Powell v. Town of Sharpsburg, 591 F. Supp. 2d 814, 820-21 (E.D.N.C. 2008). However, as the Fourth Circuit Court of Appeals has stated, "while the spoliation of evidence may give rise to court imposed sanctions deriving from th[e] inherent power [to control the judicial process and litigation], the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). As a result, these cases are inapplicable to plaintiff's substantive claim for obstruction of justice under North Carolina law.

have included any information relevant to plaintiff's claims, and, if so, whether such relevant evidence would have weighed in plaintiff's favor. Because the content of the lost evidence is unknown, there is simply no way of ascertaining the extent to which the proof would have benefitted either plaintiff or Dal-Tile, and, therefore, it is impossible to identify whether plaintiff was actually harmed. Plaintiff has provided absolutely no evidence of causation, and she has made no attempt to quantify the amount of her actual damages. Thus, she fails to carry her burden on summary judgment, and her obstruction of justice claim fails as a matter of law.[41]

### III. CONCLUSION

The court has considered all of the parties' arguments, the record of this matter, and the relevant legal precedent, and has concluded that there is no genuine dispute of material fact to be resolved. Accordingly, Dal-Tile's motion for summary judgment (DE # 60) is GRANTED. The Clerk is directed to enter judgment in favor of Dal-Tile and close the case.

This 14 March 2013.

_____
W. Earl Britt
Senior U.S. District Judge

---

[41] The court disagrees with plaintiff's argument that this holding "would allow the routine destruction of evidence because no one could prove what was missing, and thus, could never show harm." (Pl.'s Mem. Opp'n Mot. Summ. J., DE # 78, at 37.) A party who is deprived of evidence is not left without effective remedies. Federal courts possess broad discretion to provide proportionate relief in situations involving destroyed evidence, such as precluding proof favorable to the wrongdoer to restore balance to the litigation or employing an adverse inference instruction, under which the finder of fact may infer that the destroyed evidence would have been favorable to the opposing side. See, e.g., Silvestri, 271 F.3d at 590. These types of appropriately tailored sanctions are a more efficacious remedy than allowing an independent cause of action that would necessarily be based upon speculation and conjecture to proceed to trial.